# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Continental Casualty Co. v. Howard Hoffman & Associates, 2011 IL App (1st) 100957**

---

| | |
|---|---|
| Appellate Court Caption | CONTINENTAL CASUALTY COMPANY, Plaintiff-Appellee, v. HOWARD HOFFMAN AND ASSOCIATES; HOWARD HOFFMAN; GERALD H. COHEN; and ESTATE OF THOMAS GOLDSTON, Darlene Waters, Administrator, Defendants-Appellants (Estate of Phillip Ewing, Sr., Thomas Leinenweber, Public Administrator; Estate of Fannie McAllister, Vera Posey, Executor; Estate of Butler Tolbert, Ira Tolbert, Administrator; Estate of Harold Pruitt, Lamon Prymil, Administrator; Estate of James Richardson, Ruthie Birt, Executor; Estate of Robie Butcher, Gary T. Butcher, Administrator; Estate of Curtis Hagler, George B. Randolph, Executor; Estate of Oscar Oboza, Sr., Oscar Obozo, Administrator; Estate of Frances Johnson, Renae Murphy, Executor; Estate of Benjamin Rogers, Julia L. Smith, Administrator, and Brittany Chaney, Defendants). |
| District & No. | First District, First Division Docket Nos. 1-10-0957, 1-10-1080 cons. |
| Filed | August 15, 2011 |
| Rehearing denied | September 20, 2011 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a declaratory judgment action brought by defendant law firm's insurer, the trial court properly determined that the numerous claims against the firm as the result of an employee's embezzlement scheme arising from the management of several probate estates should be treated as a single, related claim subject to the $100,000 "each claim" limit. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CH-25568; the Hon. Stuart E. Palmer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Cantwell & Cantwell, of Chicago (Peter A. Cantwell and Paul Hammond, of counsel), for appellant Estate of Thomas Goldston. |
| | Collins Bargione & Vukovich, of Chicago (George B. Collins and Benjamin C. Butler, of counsel), for appellant Howard Hoffman & Associates. |
| | Troutman Sanders LLP, of Chicago (Christopher H. White, of counsel), and Wiley Rein LLP, of Washington D.C. (Richard A. Simpson and Gary P. Seligman, of counsel), for appellee. |
| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion. Presiding Justice Hall and Justice Hoffman concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendants-appellants, Howard Hoffman & Associates, a law firm, Howard Hoffman and Gerald H. Cohen, lawyers (collectively, the Hoffman defendants), and the estate of Thomas Goldston, Darlene Waters, administrator (Goldston Estate), have appealed from an order entering summary judgment in favor of the Hoffman defendants' legal professional liability insurer, plaintiff-appellee Continental Casualty Company (Continental). In this action for declaratory judgment, Continental sought a determination that its indemnity obligation to the Hoffman defendants with respect to a number of underlying claims and lawsuits was limited to a $100,000 policy limit for multiple claims that are considered "related" under the liability policy rather than a $300,000 aggregate policy limit for multiple claims that are unrelated.

¶ 2 In appeal No. 1-10-0957, the Hoffman defendants assert that the circuit court improperly found that their Continental insurance policy provided only $100,000 in coverage for the underlying claims and lawsuits. In appeal No. 1-10-1080, the Goldston Estate makes similar arguments while also maintaining that Continental's declaratory judgment action was

improperly premature because liability had not yet been determined in its underlying suit against the Hoffman defendants. These two appeals have now been consolidated, and for the following reasons we affirm.

¶ 3                                          I. BACKGROUND

¶ 4        Continental filed its initial complaint for declaratory judgment in July of 2008. In an amended complaint filed in March of 2009, Continental generally alleged that it had issued a lawyer's professional liability policy insuring the Hoffman defendants and covering the period from December 30, 2005, to December 30, 2006. In a letter dated February 1, 2006, the Hoffman defendants informed Continental that one of the nonlawyer employees of the Howard Hoffman & Associates law firm, Ms. Judith Stachura, had "embezzled significant funds" from at least 16 probate estates that were represented by the firm. Continental further alleged that claims for losses resulting from this embezzlement had been asserted against the Hoffman defendants by 12 of these estates, including claims made by 3 estates in the circuit court of Cook County. These included claims made in the following actions: (1) Estate of Fannie McAllister v. Law Offices of Howard Hoffman & Associates, No. 2007-L-013531 (Cir. Ct. Cook Co.) (McAllister estate); (2) Estate of Darnell Chaney, No. 2005-P-3453 (Cir. Ct. Cook Co.) (Chaney estate); and (3) Estate of Thomas Goldston v. Law Offices of Howard Hoffman & Associates, No. 2008-CH-03280 (Cir. Ct. Cook Co.) (Goldston estate).

¶ 5        The amended complaint also asserted that the Hoffman defendants had informed Continental that total losses from Ms. Stachura's embezzlement were expected to exceed $300,000. Furthermore, a dispute had arisen between Continental and the Hoffman defendants regarding the parties' respective rights and obligations under the liability policy issued by Continental, which contained a "per claim" liability limit of $100,000 and an "aggregate" limit of $300,000. Continental contended that a single $100,000 limit applied to all claims arising out of Ms. Stachura's embezzlement scheme, while the Hoffman defendants contended that it faced multiple, unrelated claims and that the $300,000 aggregate policy limit therefore applied.

¶ 6        Finally, Continental's complaint alleged that its claim expenses would reduce the amount of insurance coverage available to pay damages to the estate claimants under the terms of its policy. Therefore, the Hoffman defendants assumed their own defense pursuant to an agreement under which Continental would pay a single, per-claim limit of $100,000, less previously incurred claim expenses, and both Continental and the Hoffman defendants would reserve their right to seek a judicial determination as to the actual amount of coverage available under the policy. Pursuant to that agreement, Continental's complaint sought a declaration that it only had $100,000 of liability under its policy and had therefore fulfilled its obligations and exhausted its liability under the policy by paying the single, per-claim limit of $100,000 to the Hoffman defendants. The 12 estate claimants were made defendants in this suit "to ensure that the Court can provide complete relief to all affected parties."

¶ 7        A copy of the insurance policy Continental issued to the Hoffman defendants was attached to the amended complaint. The policy provides lawyer's liability coverage to Howard Hoffman & Associates, Howard Hoffman, and Gerald H. Cohen, and the

-3-

declarations page indicates the policy contains a limit of liability, inclusive of claim expenses, of $100,000 for "Each Claim" and $300,000 in the "Aggregate." The policy also contains the following relevant provisions:[1]

"I. INSURING AGREEMENT

A. Coverage

The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable[.] ***

\* \* \*

D. Exhaustion of limits

The **Company** is not obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle a **claim** after the applicable limit of the **Company's** liability has been exhausted by payment of **damages** or **claim expenses** or by any combination thereof or after the **Company** has deposited the remaining available limits of liability into a court of competent jurisdiction. ***

\* \* \*

II. LIMITS OF LIABILITY AND DEDUCTIBLE

A. Limit of liability–each **claim**

Subject to paragraph B. below, the limit of liability of the **Company** for **damages** and **claim expenses** for each **claim** first made against the **Insured** and reported to the **Company** during the **policy period** shall not exceed the amount in the Declarations for each **claim.**

B. Limit of liability–in the aggregate

The limit of liability of the **Company** for **damages** and **claim expenses** for all **claims** first made against the **Insured** and reported to the **Company** during the **policy period** shall not exceed the amount stated in the Declarations as the aggregate.
\*\*\*

D. Multiple **insureds, claims** and claimants

The limits of liability shown in the Declarations and subject to the provisions of this Policy is the amount the **Company** will pay as **damages** and **claim expenses** regardless of the number of **Insureds, claims** made or persons or entities making **claims.** If **related claims** are subsequently made against the

---

[1]The policy further provides that "[w]ords and phrases that are in bold are defined in the Definitions section of this Policy." We will preserve that formatting in our citations to the relevant policy provisions throughout this opinion.

**Insured** and reported to the **Company,** all such **related claims,** whenever made, shall be considered a single **claim** first made and reported to the **Company** within the **policy period** in which the earliest of the **related claims** was first made and reported to the **Company.**

\* \* \*

III. DEFINITIONS

Wherever used in this Policy:

\*\*\*

B. **'Claim'** means a demand received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failing to render **legal services.** A demand shall include the service of suit or the institution of an arbitration proceeding against the **Insured.**

\* \* \*

O. **'Related acts or omissions'** mean all acts or omissions in the rendering of **legal services** that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.

P. **'Related claims'** mean all **claims** arising out of a single act or omission or arising out of **related acts or omissions** in the rendering of **legal services.**"

¶ 8      The amended complaint was served upon each of the defendants, but appearances and answers to the complaint were filed only by the Hoffman defendants and representatives of the McAllister and Goldston estates. Ultimately, Continental filed a summary judgment motion and the Hoffman defendants filed a cross-motion for summary judgment. Attached to these motions were a number of documents supportive of the parties' arguments.

¶ 9      For example, attached to Continental's motion for summary judgment was a copy of the February 1, 2006, letter in which the Hoffman defendants informed Continental about Ms. Stachura's embezzlement scheme. In turn, attached to that letter was a notarized statement completed by Ms. Stachura on January 27, 2006. In that statement, Ms. Stachura indicated that she was a probate paralegal for the Hoffman defendants' law firm and her duties included managing the firm's probate and estate files and accounts. Ms. Stachura also stated:

"I acknowledge that in the course of handling these various probate/estate matters, I forged the Administrator's or Executor's name to certain checks made out to my order and caused the monthly bank statements as received to be destroyed so that my actions would not appear when an attorney worked on a file. The ledger sheet in each file appeared correct since I did not list the forged checks thereon and same would always reflect a balance consistent with legitimate checks as shown."

¶ 10      Ms. Stachura also indicated that "[n]o other person in my office, the attorneys or my family, had any knowledge of my criminal acts" and that she "used the money for gambling purposes or to cover forgeries on estates which were closed and distributions made prior."

¶ 11      Continental's motion also contained documents related to the McAllister, Chaney, and Goldston estates, including copies of pleadings filed in those actions. Pleadings filed in the McAllister and Chaney estates generally alleged that one or more of the Hoffman defendants

were retained to represent the respective estates. The pleadings further sought to recover for the losses allegedly incurred as a result of the Hoffman defendants' improper failure to manage estate litigation or to supervise the actions of Ms. Stachura. The claims made by the McAllister estate were ultimately settled, with the Hoffman defendants contributing $15,000 and agreeing that the McAllister estate would be entitled to up to $10,180 in additional funds obtained as a result of any declaratory judgment action involving the Hoffman defendants and their liability insurer. The claims made by the Chaney estate were settled in a similar fashion, with Howard Hoffman contributing $54,313.47 and agreeing that the estate would be paid up to $42,561.79 if any additional funds were obtained as a result of the instant litigation. Both matters were subsequently dismissed pursuant to these settlement agreements.

¶ 12      The Goldston estate's complaint against the Hoffman defendants also generally asserted that its losses resulted from the Hoffman defendants' failure to properly manage the estate's litigation or to supervise the actions of Ms. Stachura, but the estate made other additional allegations. Specifically, the complaint asserted that the Hoffman defendants represented both the Goldston estate and the estate of Benjamin Rogers (Rogers estate). The Goldston estate was a beneficiary of the Rogers estate, and Malcolm Goldston was the prior administrator of the Goldston estate. The complaint further alleged that while certain distributions had been made from the Goldston and Rogers estates, including distributions to Malcolm Goldston, full distributions from those estates were never made. Nevertheless, a "Final Account" was presented to the circuit court indicating that full distributions had in fact been made in both estates. The Goldston estate asserted that the Hoffman defendants acted improperly by making payment of Goldston estate proceeds to only certain estate beneficiaries (including Malcolm Goldston), presenting an incorrect "Final Account" to the circuit court, and failing to advise the Goldston estate of possible conflicts of interest and the need to obtain substitute counsel. The Goldston estate's claims remain pending in the circuit court.

¶ 13      The Goldston estate filed a response to Continental's motion. In that response, the Goldston defendants also attached a number of documents. These documents established that Ms. Stachura pled guilty to 11 separate charges of theft in 11 separate criminal cases involving her embezzlement of estate funds. With respect to each conviction, a judgment for restitution was entered in favor of each of the 11 different estates involved in the criminal charges, with the total amount of restitution awarded exceeding $600,000.

¶ 14      Following oral argument, the circuit court granted Continental's motion for summary judgment and denied the Hoffman defendants' cross-motion. The circuit court found that the policy issued by Continental contained definitions of "related claims" and "related acts or omissions" that were both clear and unambiguous and therefore those definitions would control any interpretation of the policy. Turning to the allegations made against the Hoffman defendants in the underlying suits, the court found that "all of the Insured's acts or omissions were connected to Stachura's overall scheme to divert funds fraudulently from the defendant estates to herself." Therefore, the court found that the claims of all the estates should be treated as a single, related claim under the policy and the "each claim" policy limit of $100,000 should apply.

¶ 15    The Hoffman defendants filed an appeal from this decision, and the Goldston estate subsequently filed its own appeal.

¶ 16                                  II. ANALYSIS

¶ 17    As noted above, in their respective appeals the Hoffman defendants and the Goldston estate both challenge the circuit court's judgment in favor of Continental. The Goldston estate also asserts that Continental's declaratory judgment action was improperly premature. We first address the ripeness issue before considering the propriety of the circuit court's award of summary judgment in favor of Continental.

¶ 18                                  A. Ripeness

¶ 19    The Code of Civil Procedure provides:

> "The court may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested. The foregoing enumeration does not exclude other cases of actual controversy. The court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2-701(a) (West 2008).

Thus, it is long been understood that complaints for declaratory judgment must show that the issues of the case are not moot or premature, as courts should not "pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events." *Stokes v. Pekin Insurance Co.*, 298 Ill. App. 3d 278, 281 (1998) (citing *Pincham v. Cunningham*, 285 Ill. App. 3d 780, 782 (1996)). As such, whether " 'the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it.' " *Czapski v. Maher*, 385 Ill. App. 3d 861, 867 (2008) (quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 127 (1992)).

¶ 20    It is on this basis that the Goldston estate contends that this declaratory judgment action is premature. As the Goldston estate notes, Continental seeks only a ruling on the limits of its indemnity obligations and no liability has yet been established in its underlying lawsuit against the Hoffman defendants. The Goldston estate also asserts that because the two settlements in the McAllister and Chaney estates did not total more than $100,000, any determination of Continental's obligation for any amounts over that amount is not yet necessary. We disagree.

¶ 21    As an initial matter, we agree with Continental that the Goldston estate has waived the ripeness issue by failing to raise it in the trial court below. *Stokes*, 298 Ill. App. 3d at 283 ("the issue of ripeness is not jurisdictional and may be waived if not raised in the circuit

court"); *Gregory v. Farmers Automobile Insurance Ass'n*, 392 Ill. App. 3d 159, 162 (2009) (the issue of ripeness waived where not raised below). While the estate contends that this issue was "essential to the judgment" and therefore could not be waived, our supreme court has only recently reaffirmed that ripeness is "subject to forfeiture if not raised in the trial court." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 253 (2010).

¶ 22      Waiver aside, we find that this action was not brought prematurely. This lawsuit involves claims by a total of 12 estates, Continental has not challenged the fact that these claims are covered by its policy, and there does not appear to be any dispute that total losses will significantly exceed $300,000. Continental has already paid the Hoffman defendants its $100,000 single-claim limit, less certain claim expenses, and those funds have been used to settle some of the underlying claims. Both the McAllister and Chaney estates have dismissed their suits pursuant to settlement agreements with the Hoffman defendants. The combined claims already paid in just these two settlements total nearly $70,000. Furthermore, pursuant to those settlements the McAllister and Chaney estates (or beneficiaries thereof) are entitled to over $50,000 of the $200,000 in additional insurance coverage that would be available should Continental be unsuccessful in this declaratory judgment action.

¶ 23      The Goldston estate's argument focuses too closely on its own unresolved claims against the Hoffman defendants. It does not account for the fact that Continental brought this suit against it, the Hoffman defendants, and 11 other estates in order, as it stated in its complaint, to "ensure that the Court can provide complete relief to all affected parties." While liability has not been established in the claims brought by the Goldston estate, settlements have been completed with respect to the claims of the McAllister and Chaney estates. The resolution of this coverage action is of obvious present interest to those claimants–who are also parties to this suit–as it will necessarily determine what, if any, additional recovery they will receive pursuant to their settlement agreements with the Hoffman defendants. As such, a decision in this case is capable of terminating "the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2-701(a) (West 2008). Moreover, despite the fact that no liability has yet been determined with respect to its claims, the Goldston estate is properly a party to this coverage litigation as "the injured party is a necessary party to the suit because he or she has a substantial right in the insurance policy's viability." *Skidmore v. Throgmorton*, 323 Ill. App. 3d 417, 421 (2001).

¶ 24                                B. Summary Judgment

¶ 25      Having determined that this case is indeed ripe for adjudication, we now consider the circuit court's award of summary judgment to Continental. The Hoffman defendants and the Goldston estate challenge the circuit court's ruling by asserting: (1) the trial court erred in finding the policy language unambiguous; and (2) regardless of the whether the policy language was ambiguous, the various claims against the Hoffman defendants were not "related."

¶ 26                                1. Standard of Review

¶ 27      Summary judgment is appropriate only where the pleadings, depositions, admissions and

affidavits, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008). "The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). Our review of an order granting summary judgment is *de novo*. *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 400 (2010).

¶ 28                                    2. Ambiguity

¶ 29    Our first consideration is whether the circuit court properly found the language at issue here unambiguous, as this determination will greatly impact the remainder of our discussion. The relevant analytical framework for this question was recently summarized in an opinion of this court, wherein we noted that an insurance policy:

> "is a contract and, as such, is subject to the same rules of interpretation that govern the interpretation of contracts. [Citation.] Accordingly, when construing the language of an insurance policy, the court's primary objective is to determine and effectuate the parties' intentions as expressed in their written agreement. [Citation.] If the terms in the policy are 'clear and unambiguous,' they must be given their plain and ordinary meaning. [Citation.] If the terms are ambiguous, meaning that they are susceptible to more than one reasonable interpretation, they will be construed strictly against the insurer. [Citation.] The court will interpret the policy as a whole, considering the type of insurance purchased, the nature of the risks involved, and the purpose of the contract. [Citation.] Limiting provisions in the policy are construed liberally in favor of the insured and against the insurer. [Citation.]
>
> When determining whether an ambiguity between the terms of an insurance policy exists, the provisions should be read together and not separately. [Citation.] The inquiry is whether the provision is subject to more than one reasonable interpretation, not whether other possibilities can be suggested. [Citation.]" *Erie Insurance Exchange v. Triana*, 398 Ill. App. 3d 365, 368 (2010).

¶ 30    The Continental policy at issue here is a claims-made policy, which provides the insureds with coverage for claims by third-parties that are both made and reported during the policy period. *Uhlich Children's Advantage Network v. National Union Fire Co. of Pittsburgh*, 398 Ill. App. 3d 710, 715 (2010). The specifically relevant policy language involves the proper treatment of **"Claims"** and **"Related claims."** A **"Claim"** is defined in the policy as "a demand received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failing to render **legal services." "Related claims"** are defined in the policy as "all **claims** arising out of a single act or omission or arising out of **related acts or omissions** in the rendering of **legal services.**" In turn, the policy provides that " **'[r]elated acts or omissions'** mean all acts or omissions in the rendering of **legal services** that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." The policy

-9-

then indicates, in a section involving "[m]ultiple **insureds, claims** and claimants," that "[i]f **related claims** are subsequently made against the **Insured** and reported to the **Company,** all such **related claims,** whenever made, shall be considered a single **claim** first made and reported to the **Company** within the **policy period** in which the earliest of the **related claims** was first made and reported to the **Company.**"

¶ 31 When combined together, the plain language of these various policy provisions therefore specifies that "all claims" arising out of "all acts or omissions in the rendering of **legal services** that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision" shall be considered a single, related "demand received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failing to render **legal services.**" As such, each such related claim is subject to the $100,000 "Each Claim" limit of liability contained in the policy's declarations page, as a separate policy section provides that "the limit of liability of the **Company** for **damages** and **claim expenses** for each **claim** first made against the **Insured** and reported to the **Company** during the **policy period** shall not exceed the amount in the Declarations for each **claim.**"

¶ 32 Both the Hoffman defendants and the Goldston estate assert that the policy's inclusion of the phrase "logically *** connected" in its definition of related acts or omission renders the policy ambiguous on its face and as a matter of law, pursuant to the decision in *Village of Camp Point v. Continental Casualty Co.*, 219 Ill. App. 3d 86 (1991). In that case, the Fourth District of the Appellate Court was required to determine whether a number of actions on the part of an insured lawyer constituted a single occurrence or multiple occurrences under the terms of four successive professional liability policy periods. *Id.* at 87. In three of the four policy periods, the policies at issue provided coverage for an "occurrence," which was defined to include an act or omission of the insured. In the fourth and final period, the relevant language was changed to provide coverage for a "claim," but coverage was still provided for claims involving an insured's acts or omissions. In all cases, the policy language indicated that a " 'series of related' " acts or omissions would be treated as a single " 'occurrence' " or " 'claim.' " *Id*. at 88-89. The court in *Camp Point* treated these two terms as interchangeable, as its entire analysis is devoted to a determination of the number of "occurrences" under the policies in question. *Id.* at 98-99.

¶ 33 In finding that the insured's actions were in fact separate and unrelated occurrences, the *Camp Point* decision quoted extensively from an opinion of the Arizona Supreme Court. *Id.* at 98-102 (citing *Arizona Property & Casualty Insurance Guaranty Fund v. Helme*, 735 P.2d 451 (Ariz. 1987)). In *Helme*, 735 P.2d at 456, the Arizona Supreme Court had to determine the number of occurrences caused by the insureds' acts or omissions under the language of a policy substantially the same as the policies in *Camp Point*. The court noted that the policy in question contained a provision combining " 'related' " acts and omissions into a single " 'occurrence,' " and that the term " 'related' " was not further defined. *Id*. The court cited the dictionary definition of "the intransitive verb 'relate' as 'show[ing] or establish [ing] a logical or causal connection between.' " *Id.* (quoting Webster's Third New International Dictionary 1916 (1985)). The court then cast doubt on utilizing the concept of a " 'logical connection' " to determine if actions are considered 'related' " under the provisions of an

-10-

insurance policy such that they should be treated as a single " 'occurrence.' " *Id*. The *Camp Point* decision's lengthy quotation of *Helme* included the following portion of the Arizona Supreme Court's opinion:

> " 'We do not believe that the word "related" as used in the policy can be equated with the phrase "logical connection." Logic, like beauty, is in the eye of the beholder and greatly depends upon the subjective mental process of the reviewer. Incidents may be "logically related" for a wide variety of indefinable reasons. Causal connection depends, to a much greater extent, on objective facts in the record. If we were compelled to equate "related" with "logically connected," we would be compelled to find the policy provision ambiguous ***.' " *Camp Point*, 219 Ill. App. 3d at 100 (quoting *Helme*, 735 P.2d at 456).

¶ 34        We do not find the *Camp Point* and *Helme* decisions to be on point, nor do we find the concerns as to "logical connection" expressed in *Helme* as quoted in *Camp Point* to be persuasive for finding an ambiguity in the policy before us. As an initial matter, in neither case was the policy language at issue similar to the language here. In neither case did the insurance policies themselves specifically define a related claim or occurrence to include the concept of a logical connection. *Camp Point*, 219 Ill. App. 3d at 88-89; *Helme*, 735 P.2d at 456. Furthermore, the extent to which the *Camp Point* decision actually relied upon this exact portion of the very lengthy citation to *Helme* is unclear, as this specific reasoning is never discussed in the Illinois court's analysis. Finally, there was no contention in *Camp Point* that the policy language was ambiguous and the court did not hold that the phrase "logically connected" was ambiguous as a matter of law. (Internal quotation marks omitted.) *Camp Point*, 219 Ill. App. 3d at 100.

¶ 35        In any case, even assuming that the *Camp Point* decision can be seen as endorsing the notion that a "logical" connection should not be incorporated into the concept of relatedness in insurance policies, we find that any such reasoning has been persuasively rejected in several subsequent decisions from other courts. See *Continental Casualty Co. v. Wendt*, 205 F.3d 1258, 1262-63 (11th Cir. 2000) (*per curiam*) ("the plain meaning of the word 'relate' is 'to show or establish a logical or causal connection between' " (quoting district court opinion)); *Gregory v. Home Insurance Co.*, 876 F.2d 602, 606 (7th Cir. 1989) (same); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.*, 855 P.2d 1263, 1274 (Cal. 1993) (same).

¶ 36        Indeed, while policy language similar to that at issue here does not appear to have been addressed by any appellate court in this state, at least two other jurisdictions have found the relevant policy language contained in Continental's policy to be unambiguous and enforceable. See *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 395 (2005) (decisions from other jurisdictions, while not binding, may be considered as persuasive authority). In *Bryan Brothers Inc. v. Continental Casualty Corp.*, 704 F. Supp. 2d 537, 543 (E.D. Va. 2010), a federal district court was asked to interpret a Continental professional liability policy that defined " 'interrelated acts or omissions' as 'all acts or omissions in the rendering of professional services that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.' " The court specifically found this language to be unambiguous and applied it as written. *Id.*

Similarly, in *Berry & Murphy, P.C. v. Carolina Casualty Insurance Co.*, 586 F.3d 803, 810 (10th Cir. 2009), the federal circuit court addressed a policy which defined a "related wrongful act" as wrongful acts "which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision." Again, this language was determined to be unambiguous and enforceable. *Id.* at 812.

¶ 37     Notably, in *Berry & Murphy* the federal circuit court cited approvingly the analysis contained in a decision of the federal district court in Colorado. *Id.* at 811 (citing *Professional Solutions Insurance Co. v. Mohrlang*, No. 07-cv-02481-PAB-KLM, 2010 WL 321706 (D. Colo. Feb. 10, 2009)). In that case, the district court found unambiguous and enforceable Continental policy definitions of the phrases "related claims" and "related acts or omissions" that are *exactly* the same as those involved in this appeal. *Mohrlang*, 2010 WL 325903, at *9.

¶ 38     We are persuaded by this case law and hold that the policy definitions of "related claims" and "related acts or omissions" contained in the Continental policy at issue here are not ambiguous because they include the concept of a logical connection. As the court found in *Gregory*, 876 F.2d at 606, simply because "[a]t some point, of course, a logical connection may be too tenuous reasonably to be called a relationship" does not mandate that the concept of a logical connection cannot be applied to determine relatedness under a policy of insurance.

¶ 39     We similarly reject the Goldston estate's contention that there is an ambiguity in the way the Continental policy handles the terms "each claim," a "single claim," and "all claims." Specifically, the estate notes that the policy declaration page indicates the policy contains a limit of liability, inclusive of claim expenses, of $100,000 for "Each Claim" and $300,000 in the "Aggregate." Appropriately, the policy also contains a section entitled "Limit of liability–each **claim**" which states that "the limit of liability of the **Company** for **damages** and **claim expenses** for each **claim** first made against the **Insured** and reported to the **Company** during the **policy period** shall not exceed the amount in the Declarations for each **claim**," *i.e.*, $100,000.

¶ 40     However, the Goldston estate notes that the relevant provision involving "[m]ultiple **insureds, claims** and claimants" does not use the phrase "each claim" but instead discusses the new and undefined phrase, a "single claim." That provision states that "[i]f **related claims** are subsequently made against the **Insured** and reported to the **Company,** all such **related claims,** whenever made, shall be considered a single **claim** first made and reported to the **Company** within the **policy period** in which the earliest of the **related claims** was first made and reported to the **Company.**" The Goldston estate then contends that because the terms "single" and "single claim" are never defined, the policy fails to clarify whether "single" claims are subject to the "Aggregate" limit of liability or are subject to the "each claim" limit.

¶ 41     The Goldston estate similarly points out that a policy provision entitled "Limit of liability–in the aggregate" provides that "[t]he limit of liability of the **Company** for **damages** and **claim expenses** for all **claims** first made against the **Insured** and reported to the **Company** during the **policy period** shall not exceed the amount stated in the Declarations

as the aggregate"; *i.e.*, $300,000. Again, the Goldston estate notes that this provision speaks of "all **claims**" and does not discuss the "each claim" limit. The estate therefore contends that these provisions, when read together, are ambiguous and could reasonably be read to indicate that multiple, related claims which constitute a "single claim" can trigger the $300,000 "Aggregate" policy limit.

¶ 42        We find that the Goldston estate is attempting to create ambiguity where none exists. As noted above, "[w]hen determining whether an ambiguity between the terms of an insurance policy exists, the provisions should be read together and not separately. [Citation.] The inquiry is whether the provision is subject to more than one reasonable interpretation, not whether other possibilities can be suggested." *Triana*, 398 Ill. App. 3d at 368. The $100,000 policy limit clearly applies to "each claim" and is stated in the singular. That limit is expressly made "[s]ubject to" the provisions of the $300,000 "Aggregate" limit, which speaks in the plural and therefore provides the appropriate policy limit for "all claims" during the policy period when there is more than a single claim. In turn, the provision involving "[m]ultiple **insureds, claims** and claimants" provides that multiple claims will nevertheless be treated as a "single claim" where they are "related."

¶ 43        Reading all these provision together, we agree with Continental that because the policy indicates that related claims will be treated as a "single" claim, such related claims are subject to the $100,000 policy limit for "Each Claim." Indeed, if multiple claims that are nevertheless "related" under the policy were to be considered separate claims capable of triggering the "Aggregate" policy limit, there would simply be no reason for the policy to include language that "all such **related claims,** whenever made," will be considered a single claim. We will not construe the Continental policy so as to render this language meaningless. *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371 (2007) ("Because the court must assume that every provision was intended to serve a purpose, an insurance policy is to be construed as a whole, giving effect to every provision [citation] ***.").

¶ 44                            3. Application of the Policy Language

¶ 45        Having determined that the circuit court properly found the relevant language in the Continental policy to be unambiguous, we now turn to the issue of the proper application of that policy language, *i.e.*, did the circuit court correctly determine that all of the Hoffman defendants' alleged acts or omissions were so related that the claims against them should all be treated as a single, related claim subject to the $100,000 "each claim" limit under the policy? Here, coverage under the Continental policy is being sought for claims alleging various acts or omissions allegedly committed by the Hoffman defendants with respect to their representation of the estates.

¶ 46        As discussed above, the relevant policy language provides that claims will be considered related only if they arise out of a single act or omission or "acts or omissions in the rendering of **legal services** that are temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." Continental asserts that all of the Hoffman defendants' alleged acts or omissions can be connected under this provision by Ms. Stachura's embezzlement scheme. Thus, two relevant questions are before this court:

(1) were all of the alleged acts and omissions of the Hoffman defendants temporally, logically, or causally connected by Ms. Stachura's embezzlement of estate funds? and (2) was Ms. Stachura's embezzlement of estate funds a common fact, circumstance, situation, transaction, event, advice or decision under the policy? If both of these questions can be answered in the affirmative, then all of the claims against the Hoffman defendants are related under the terms of the policy and the $100,000 "each claim" policy limit applies. We address these questions in reverse order, as our analysis of the second question will aid in the resolution of the first.

¶ 47                                    a. The Nature of Ms. Stachura's Embezzlement

¶ 48    There is no dispute regarding the facts involving Ms. Stachura. In her notarized statement, Ms. Stachura stated that she was a probate paralegal for the Hoffman defendants' law firm and had been employed by the firm for over 25 years. Her duties included the management of the firm's probate estate files, which required a number of activities "including but not limited to collecting assets, follow-up correspondence, keeping the financial ledger sheet on the estate account, receiving and reviewing monthly bank statements relating thereto and otherwise preparing general correspondence, etc. [*sic*] on the file in the course of usual probate proceedings." Ms. Stachura further admitted that while engaged in the management of the firm's probate estate files, she made out checks to herself on the accounts of at least 15 different estates, including the Goldston, McAllister, and Chaney estates.

¶ 49    These forgeries were concealed, at least for a time, by Ms. Stachura's scheme of causing: "the monthly bank statements as received to be destroyed so that [her] actions would not appear when an attorney worked on a file. The ledger sheet in each file appeared correct since [she] did not list the forged checks thereon and same would always reflect a balance consistent with legitimate checks as shown." Furthermore, Ms. Stachura indicated that "[n]o other person in [her] office, the attorneys or [her] family, had any knowledge of [her] criminal acts" and that she "used the money for gambling purposes or to cover forgeries on estates which were closed and distributions made prior." Ms. Stachura ultimately pled guilty to 11 separate charges of theft, was sentenced to probation, and a judgment for restitution was entered in favor of each of the 11 different estates involved in the criminal charges. These included awards of restitution in favor of the McAllister and Chaney estates, as well as the Rogers estate to which the Goldston estate was a beneficiary.

¶ 50    The question is, do these undisputed facts amount to "any common fact, circumstance, situation, transaction, event, advice or decision" under the related acts or omissions provision of the policy? As these terms are not further defined in the policy, we will give them their "plain and ordinary meaning." *Triana*, 398 Ill. App. 3d at 368. Of the many terms included in this provision, those that seem most relevant to the issues here are "fact," "circumstance," "situation," and "decision." A "fact" can be defined as "a thing done," "an action in general," or a "wrong or unlawful deed." Webster's Third New International Dictionary 813 (1993). A "circumstance" can be defined as "a condition, fact, or event accompanying, conditioning, or determining another" or as "the sum of essential and environmental characteristics." *Id.*

-14-

at 410. In turn, a "situation" can be defined as a "combination of circumstances at a given moment." *Id.* at 2129. Lastly, a "decision" can be defined as "a course of action decided upon." *Id.* at 585.

¶ 51 While the Illinois Appellate Court has not considered this specific policy language, at least one federal district court has done so with respect to similar language under similar circumstances.

¶ 52 In *Bryan Brothers*, 704 F. Supp. 2d at 538-39, the court decided a declaratory judgment action involving an accounting firm, Bryan Brothers, Inc., to which Continental had issued a claims-made professional liability policy similar to the one at issue here. The accounting firm sought coverage under the policy after a number of its clients filed suit to recover for losses resulting from the embezzlement of funds from their accounts by the firm's bookkeeper, Ms. Whitworth. *Id*. To accomplish the fraud, Ms. Whitworth made out checks drawn on client accounts payable to herself and others and manipulated the internal bookkeeping records of the firm to conceal her theft. *Id.* at 539. The bookkeeper's actions had occurred both before and after the time the Continental policy was in effect, but were only discovered during the policy's effective period. *Id*. Prior to that time, no other employees of the accounting firm "were aware of her activities nor did any other employees participate in or authorize her actions." *Id.* Continental denied coverage, asserting that because the bookkeeper was an insured under the policy and because she obviously knew about her actions before the policy took effect, the claims for those embezzlements occurring before the policy period were barred by a "prior knowledge" exclusion in the policy. *Id.* at 541. The court agreed with Continental on this issue. *Id.*

¶ 53 Of importance here, the court also had to address the fact that in the single instance of the "Lansing" account, the bookkeeper did not begin to take funds from the account until *after* the Continental policy was in effect. *Id.* at 542-43. Obviously, these acts could not be barred on the basis that the bookkeeper had knowledge of these acts before the policy period began.

¶ 54 Nevertheless, Continental asserted that the claims involving the Lansing account were not covered by its policy because the prior knowledge provision excluded coverage unless " 'prior to the effective date of this Policy, none of you had a basis to believe that any such act or omission, or interrelated act or omission, might reasonably be expected to be the basis of a claim.' " *Id*. at 543. In turn, the policy defined " 'interrelated acts or omissions' as 'all acts or omissions in the rendering of professional services that are logically or causally connected by *any common fact, circumstance, situation, transaction, event, advice or decision*.' " (Emphasis added.) *Id*. Accordingly, if Whitworth's knowledge of her prior unauthorized withdrawals was knowledge of acts that were interrelated to her withdrawals from the Lansing account during the policy period, then her knowledge of those prior acts would exclude coverage under the prior knowledge provision. *Id.*

¶ 55 The court found such an interrelationship, reasoning:

> "[T]he Court must determine whether the Lansing withdrawal and the other withdrawals are 'logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.' Most obvious is that the Lansing

withdrawals, like the prior unauthorized withdrawals, involved the same scheme to defraud Bryan Brothers' clients by the same person wherein Whitworth drafted checks drawn on the client accounts and endorsed checks made payable to the clients. [Citation.] Whitworth also used the same modus operandi in concealing her theft by manipulating Bryan Brothers' records. [Citation.] These common ties lead to the inescapable conclusion that Whitworth's thefts against Lansing are logically connected to the prior thefts by common facts and circumstances. They are 'interrelated acts' under the policy for which there is no coverage." (Emphasis omitted.) *Id.*

¶ 56    We concur with this reasoning and find that Ms. Stachura's decision to intentionally embezzle funds from the Hoffman defendants' probate estate accounts falls squarely within the plain and ordinary meaning of the relevant terms of the Continental policy at issue here. Although the scheme involved the accounts of different estates, Ms. Stachura's actions in carrying out her embezzlement plan had "common ties" and involved the same "modus operandi." They were consistent in that she embezzled funds from only those accounts for which she had full responsibility. She then concealed her forgeries with the common scheme of destroying bank statements from each affected account and preparing false bookkeeping reports for the Hoffman defendants. Some of her forgeries were also committed in order to obtain the necessary funds to conceal prior forgeries on other estate accounts. Ms. Stachura's embezzlement scheme continued until shortly before her actions were discovered when, as she indicated in her statement, "the lack of other funds being available to cover [her] deeds occasioned [her] downfall."

¶ 57    Overall, Ms. Stachura's embezzlement scheme can be viewed as "an action in general" or a "wrong or unlawful deed" (fact). It might also be described as a "sum of essential and environmental characteristics" (circumstance) or a "combination of circumstances" (situation). Her overall scheme of embezzling funds and the methods she employed to accomplish and conceal her embezzlement can also be viewed as "a course of action decided upon" (decision). While the Hoffman defendants and the Goldston estate assert that each of Ms. Stachura's acts of forgery or embezzlement should be viewed separately and should not be considered together, the plain and ordinary meaning of the terms in the policy indicate otherwise. Ms. Stachura's scheme to embezzle estate funds is a common fact, circumstance, situation, or decision under the policy.


¶ 58                        b. Temporal, Logical, or Causal Connection

¶ 59    We now consider the alleged acts and omissions of the Hoffman defendants, and the issue of whether or not they are temporally, logically, or causally connected by a common fact, circumstance, situation, or decision; *i.e.*, are those alleged acts and omissions connected under this policy language by Ms. Stachura's scheme to embezzle estate funds?

¶ 60    Again, we are faced with the task of interpreting language–"temporally, logically, or causally connected"–that is not further defined in the policy. And again, we must first turn to the plain and ordinary meaning of those words. "Temporally" can be defined as "with regard to time." Webster's Third New International Dictionary 2353 (1993). "Logically" can

be defined as "of or relating to logic," which in turn is defined as the "interrelation or connection or sequence (as of facts or events) especially when seen by rational analysis as inevitable, necessary, or predictable." *Id.* at 1330. Finally, "casually" is defined as "expressing or indicating cause," while a "cause" is defined as "a person, thing, fact, or condition that brings about an effect" or "the necessary antecedent of an effect." *Id.* at 355-56.

¶ 61    It is clear that all of the various assertions that the Hoffman defendants somehow failed to manage litigation involving the various estates or improperly supervised the actions of Ms. Stachura–however specifically pled–are allegations of acts and omissions logically and casually connected by the embezzlement scheme. Ms. Stachura's ability to conduct and conceal her embezzlement scheme can certainly be seen as a logically "predictable" event, in light of the Hoffman defendants' alleged failure to manage accounts containing hundreds of thousands of dollars or to properly supervise the single employee in charge of those accounts. Moreover, the fact that such allegedly lax management and oversight provided Ms. Stachura with an opportunity to engage in the embezzlement scheme can certainly be viewed as a "condition that brings about an effect" (causally).

¶ 62    Nevertheless, there remain those allegations which the Goldston estate contends are not directly related to the Hoffman defendants' lax management or supervision. Specifically, the Goldston estate has additionally asserted in its complaint that the Hoffman defendants improperly:

> "c. Requested and permitted beneficiaries of the Rogers Estate and/or Goldston Estate to execute acknowledgments that they had been paid funds owed to them from the Rogers Estate and/or Goldston Estate, when in fact the funds had not been paid;
>
> d. Were involved in the preparation and presentation to the Court of documentation and representations telling the Court that funds owed to the Rogers Estate, the Goldston Estate and their beneficiaries had been paid, when in fact the funds had not been paid;
>
> e. Paid Malcolm [the estate administrator] first from the Goldston Estate proceeds, or assets being held in trust for the Goldston Estate, to the exclusion of the other beneficiaries, who have not been paid the amounts due them from the assets of the Goldston Estate, or assets being held in trust for the benefit of the Goldston Estate;
>
> * * *
>
> l. Failed to advise the Goldston Estate or the Rogers Estate and/or beneficiaries the Defendants had a conflict of interest in representing said Estates and/or their beneficiaries;
>
> m. Failed to advise the Goldston Estate and/or beneficiaries that they should obtain substitute counsel and/or a new Administrator without any conflict of interest[.]"

¶ 63    We find that these allegations are also logically and causally connected by Ms. Stachura's actions so as to be considered a related claim under the plain language of the Continental policy.

-17-

¶ 64    Initially, we note that Ms. Stachura's embezzlement scheme was a "necessary antecedent" (causally) to each of the Goldston estate's additional claims. It is apparent that any mistakes in the documents prepared by the Hoffman defendants were caused by the fact the Ms. Stachura was, at least for a time, successfully concealing her embezzlement of funds from estate accounts. Similarly, any prior payments of estate funds to Malcolm Goldston or any conflict of interest resulting from the Hoffman defendants' representation of both the Goldston estate and the Rogers estate only arises as a concern because the full assets of those estates were not properly paid to estate beneficiaries. The shortfall in estate funds is a direct result of Ms. Stachura's embezzlement scheme.

¶ 65    Additionally, the Goldston estate does not allege in its complaint that it was separately harmed by any of these additional acts or omissions on the part of the Hoffman defendants. Instead, the complaint only asserts that "damages and a loss of funds rightfully due to the Goldston Estate" were the proximate result of *all* of the alleged acts and omissions of the Hoffman defendants. The complaint then asks for recovery of "all funds wrongfully taken or withheld from the Goldston Estate." Thus, all of the Goldston estate's allegations are aimed at recovering those funds embezzled by Ms. Stachura. See *Berry & Murphy*, 586 F.3d at 813 ("Where there is one injury flowing from multiple acts of malpractice, it seems logical to connect those multiple acts of malpractice as related.' ").

¶ 66    In ruling on this issue, we reject the contention that a different conclusion is mandated by this court's decision in *Continental Casualty Co. v. Grossmann*, 271 Ill. App. 3d 206 (1995). In that case, this court addressed the similar question of whether a number of claims against an insured attorney were subject to a professional liability policy's $100,000 per-claim or $300,000 aggregate limit. *Id.* at 207. Similarly to the Continental policy here, the insurance policy at issue in *Grossman* provided that the $100,000 limit would apply to claims arising out of " 'the same or related wrongful acts.' " *Id.* at 208. This court ultimately found that because the underlying claims were pled in such a manner that they might not ultimately prove to be "related" following trial, it was improper for the circuit court in the declaratory judgment action to have found the $100,000 policy limit necessarily applied to those claims. *Id.* at 211-12.

¶ 67    We find *Grossman* to be distinguishable. First, the policy language there only provided that the $100,000 limit would apply to claims arising out of " 'the same or related wrongful acts.' " *Id.* at 208. Unlike the policy here, it did not contain any additional language further providing exactly how claims were or were not related. Furthermore, in *Grossman*, 271 Ill. App. 3d at 211, this court specifically found that the insured's "several distinct instances of malpractice led separately to the underlying plaintiffs' losses" and that "each underlying plaintiff may be able to recover on the basis of acts entirely unrelated to grounds on which the others are able to recover." *Id.* at 211, 212. As discussed above, in this case all of the estate claimants' allegations of wrongdoing and all of their allegations of damages are logically and causally connected by the common fact, circumstance, situation, or decision comprised of Ms. Stachura's scheme to embezzle estate funds.

¶ 68    We recognize that the language defining related claims in Continental's policy is broad and that, in some other case, claims might arise that arguably would be too tangentially connected to fall under these provisions. However, we need not dwell upon or define the

outer limits of the policy's "**Related acts and omissions**" and "**Related claims**" provisions to resolve the issues before this court. We simply find that based upon the specific language of the Continental policy at issue here and the specific facts of this case: (1) Ms. Stachura's scheme to embezzle estate funds is a common fact, circumstance, situation, or decision; and (2) all of the allegations against the Hoffman defendants are logically and causally connected by Ms. Stachura's scheme to embezzle. Therefore, the circuit court properly found that all of the claims against the Hoffman defendants were related, as defined under the relevant policy language, and as such the $100,000 "each claim" policy limit contained in Continental's policy applied in this case.

¶ 69                                    4. Remaining Issues

¶ 70    In so ruling, we reject a number of additional arguments raised by the Hoffman defendants and the Goldston estate. We will briefly address each of these assertions.

¶ 71    First, we reject the assertion that this matter requires the application of the "cause theory" adopted by our supreme court in cases such as *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 418-19 (2006), and *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 456-57 (2009). As noted in those cases, under this theory courts will look to the cause or causes of damages in order to determine the number of "occurrences" under an insurance policy. *Nicor*, 223 Ill. 2d at 418; *Fay*, 232 Ill. 2d at 457.

¶ 72    We do not find the "cause theory" to be relevant to our discussion, as the Continental policy at issue here does not provide coverage for "occurrences" but rather for "acts or omissions in the rendering of **legal services**." Moreover, the cause theory is applied because "occurrence" based policies often do not provide any indication as to how to determine the number of occurrences in a given situation. *Nicor*, 223 Ill. 2d at 418 ("the terms of the insurance policy are not always sufficient, standing alone, to permit a definitive determination as to whether a particular case involves one occurrence or many"); *Fay*, 232 Ill. 2d at 455 (applying cause theory "because the policy itself does not indicate when an injury will be treated as a separate occurrence"). As discussed at length above, the policy at issue here contains explicit provisions related to the determination of whether various acts or omissions constitute "related claims."

¶ 73    Second, we reject the Goldston estate's assertion that section II. D. of the Continental policy–involving "[m]ultiple **insureds, claims** and claimants"–is not applicable here. As noted above, this provision provides that "[i]f **related claims** are subsequently made against the **Insured** and reported to the **Company,** all such **related claims,** whenever made, shall be considered a single **claim** first made and reported to the **Company** within the **policy period** in which the earliest of the **related claims** was first made and reported to the **Company.**" The Goldston estate suggests that this provision does not apply to "subsequently made" related claims made during the *same* policy period, but only to claims made during *other* policy periods.

¶ 74    We disagree. First, this argument is waived because it was first raised in the Goldston estate's reply brief. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (points not argued in opening brief are waived and shall not be raised in the reply brief, in oral argument, or on petition for

-19-

rehearing). Waiver aside, this provision clearly applies to related claims, "whenever made," and is not limited in the manner suggested. Indeed, just such an argument involving this exact policy language has been previously rejected, with the court finding:

> "The language in section II. D. of the Policy, describing the limits of liability in the event of multiple claims or claimants, does not suggest that 'related claims' are exclusively those related to claims made or reported in preceding policy years. Nothing in the language suggests that 'related claims' cannot be made in the same policy year as the first-made claim, or even in immediate sequence with the first-made claim, as in the case of multiple claims in a single lawsuit. The Clients' proposed construction of the Policy invites the Court to torture the Policy language to create ambiguity ***." (Emphasis omitted.) *Continental Casualty Co. v. Orr*, No. 8:07CV292, 2008 WL 2704236, at *6 (D. Neb. July 3, 2008).

¶ 75    We find this reasoning persuasive and similarly reject the assertion that this provision does not apply to related claims that are made during a single policy period.

¶ 76    Finally, we reject the argument that limiting coverage here to the $100,000 "each claim" limit fails to comport with the "reasonable expectations" of the Hoffman defendants. Under the reasonable expectations doctrine, " '[t]he objectively reasonable expectation of all applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.' " *Smagala v. Owen*, 307 Ill. App. 3d 213, 219 (1999) (quoting Robert E. Keeton, Basic Text on Insurance Law § 6.3, at 351 (1971)).

¶ 77    A number of cases have specifically rejected the notion that the reasonable expectations doctrine applies in Illinois. See, *e.g.*, *El Rincon Supportive Services Organization, Inc. v. First Nonprofit Mutual Insurance Co.*, 346 Ill. App. 3d 96, 106 (2004); *Smagala*, 307 Ill. App. 3d at 219; *Zurich Insurance Co. v. Raymark Industries, Inc.*, 145 Ill. App. 3d 175, 192 (1986). Nevertheless, the Goldston estate cites to two cases that appear to recognize the applicability of the doctrine. *Whitt v. State Farm Fire & Casualty Co.*, 315 Ill. App. 3d 658, 662 (2000) ("Policy language must be read with reference to the facts at hand and in conjunction with the insured's reasonable expectations and the coverage intended by the policy."); *Crawford Laboratories, Inc. v. St. Paul Insurance Co. of Illinois*, 306 Ill. App. 3d 538, 544 (1999) (public policy requires that insurance contracts be construed in accord with the objectively reasonable expectations of the insured).

¶ 78    Even if the status of the reasonable expectations doctrine in Illinois is an open question, we decline to apply it here. " 'The parties to an insurance contract may incorporate in it such provisions, not in violation of law, as they choose; and it is the duty of the courts to construe and enforce the contract as made. We are not warranted, under the cloak of construction, in making a new contract for the parties.' " *Rich*, 226 Ill. 2d at 381 (quoting *Pioneer Life Insurance Co. v. Alliance Life Insurance Co.*, 374 Ill. 576, 590 (1940)). In this case, the *plain and unambiguous* language of the policy provides that the claims at issue are related and are subject to the single, $100,000 policy limit, and we do not believe that the policy language can reasonably be read otherwise. As our supreme court further stated in *Rich*, 226 Ill. 2d at 381, "[r]eading the policy as a whole, the average policyholder could not reasonably reach

a conclusion of coverage in these particular circumstances in light of the policy limitation. Applying [the Goldston estate's] contention would render the policy limitation meaningless, and read into the insurance contract something that is not there."

¶ 79                                        III. CONCLUSION

¶ 80        For the foregoing reasons, the judgment of the circuit court granting Continental's motion for summary judgment and denying the motion for summary judgment of the Hoffman defendants is affirmed.

¶ 81        Affirmed.