2024 IL App (1st) 231631-U

SECOND DIVISION
October 22, 2024

No. 1-23-1631

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| WESTROCK, CP, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CH 9052 |
| | ) | |
| LEXINGTON INSURANCE COMPANY and INDIAN | ) | |
| HARBOR INSURANCE COMPANY, | ) | Honorable |
| | ) | Cecilia A. Horan, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm the judgment of the circuit court of Cook County granting summary judgment in favor of defendants-insurers; the term "related" in a pollution liability insurance policy meant either logically or causally connected such that two pollution conditions on plaintiff-insured's property were subject to a single limit of liability; an investigatory letter to insured was not a claim within meaning of the insurance policy and a letter alleging liability was reported after the reporting period expired so that any notice of liability to the insurer was late and cannot be excused by equity.

¶ 2    Plaintiff, WestRock, CP, LLC, was the owner of property located in Montana that was used for over 50 years as a paper mill. WestRock's predecessor in interest sold the property to M2Green Redevelopment, LLC (M2 Green). The United States Environmental Protection Agency (EPA) identified the property as a potential site requiring pollution cleanup. The EPA sought to require WestRock to pay or reimburse the EPA for the cost to investigate and cleanup

two Pollution Conditions on the property. WestRock is insured for pollution cleanup by defendant Lexington Insurance Company with coverage for up to $5 million for each Pollution Condition and a maximum of $10 million in the aggregate for unrelated Pollution Conditions. Lexington paid $5 million related to one Pollution Condition but Lexington refused to pay for a second Pollution Condition alleging that it is related to the first Pollution Condition and, therefore, under the policy, not covered. WestRock filed a first amended complaint for declaratory judgment against Lexington alleging the EPA identified pollution issues that constitute a second Pollution Condition unrelated to the one Lexington already paid its limit of coverage for, which would trigger a second limit of coverage up to the $10 million limit.

¶ 3    WestRock is also insured for pollution cleanup by defendant Indian Harbor Insurance Company. The issue presented in the case against Indian Harbor is whether WestRock reported a "claim" by the EPA against WestRock within the time required by the Indian Harbor policy or, alternatively, whether WestRock's late reporting of a "claim" by the EPA should be excused. The parties filed cross-motions for summary judgment. Following hearings, the circuit court of Cook County granted Lexington's and Indian Harbor's motions for summary judgment and denied WestRock's motion for summary judgment.

¶ 4    For the following reasons, we affirm.

¶ 5                            BACKGROUND

¶ 6    WestRock is the successor in interest to the former owner of the Smurfit Stone Mill Superfund Site (the site). The site is a 3,200-acre property in Montana on which for over 50 years the predecessors in interest operated a pulp and paper mill which produced paperboard until 2010. WestRock is a named insured on the pollution liability policies covering the site.

¶ 7 The site is insured under a "Pollution Legal Liability" policy issued by Lexington and a "Pollution and Remediation Legal Liability" policy issued by Indian Harbor. The effective dates of the Lexington policy were May 3, 2011 to May 3, 2021. The Lexington policy covers remediation of on-site pollution and claims for off-site clean-up. "Coverage A" in the policy specifically covers "Governmental Claims for On-Site Clean-Up of Pre-Existing Conditions." The pollution at issue in this appeal falls under Coverage A of the Lexington policy. The policy includes a duty to defend such claims "even if groundless, false, or fraudulent." The policy includes two coverage limits, one for "each incident" and one "aggregate limit." For claims under Coverage A Lexington will pay $5 million for "each incident" as defined in the policy and the aggregate limit of coverage is $10 million. The policy defines "each incident" as "the same, related or continuous Pollution Condition."

¶ 8 The relevant effective dates of the Indian Harbor policy were August 1, 2011 to August 1, 2014. The Indian Harbor policy provides $10 million for each "Pollution Condition" with a $40 million aggregate limit. The insuring agreement in the policy states that Indian Harbor will pay for loss resulting from any Pollution Condition on the site "which the INSURED has or will become legally obligated to pay as a result of a CLAIM first made against the INSURED during the POLICY PERIOD and reported to the Company, in writing, by the INSURED during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD." The reporting requirement in the Indian Harbor policy states as follows:

"VII. REPORTING, DEFENSE, SETTLEMENT AND COOPERATION

A. As a condition precedent to the coverage hereunder, in the event any CLAIM is made against the INSURED for LOSS or REMEDIATION EXPENSE,

or any POLLUTION CONDITION is first discovered by the INSURED that results in a LOSS or REMEDIATION EXPENSE:

> 1. The INSURED shall forward to the Company or to any of its authorized agents every demand, notice, summons, order or other process received by the INSURED or the INSURED's representative as soon as practicable; and

> 2. The INSURED shall provide to the Company, whether orally or in writing, notice of the particulars with respect to the time, place and circumstances thereof, along with the names and addresses of the injured and of available witnesses. In the event of oral notice, the INSURED agrees to furnish to the Company a written report as soon as practicable."

¶ 9   The extended reporting period allows the insured to report a "claim" up to 90 days after the end of the policy period, or in this case after August 1, 2014. The Indian Harbor policy defines a "claim" as "any demand(s) or notices(s) or assertion(s) of a legal right alleging liability or responsibility on the part of the INSURED and shall include but not be limited to lawsuit(s), petitions(s), order(s) or government and/or regulator actions(s), filed against the INSURED." The Indian Harbor policy also includes a duty to defend against any "claim" seeking damages for a loss for remediation expense.

¶ 10   In April 2013 the EPA sent WestRock a letter pursuant to section 9604(e)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA,

commonly referred to as Superfund) (42 U.S.C. § 9604(e)(2) (2018) (commonly referred to as section 104(e))).[1]

¶ 11     The 104(e) letter to WestRock requested information and documents and warned that failure to respond or providing a false response could result in "an enforcement action by the EPA," fines, or criminal penalties pursuant to section 1001 of Title 18 of the United States Code (18 U.S.C. § 1001). In July 2013 WestRock responded to the 104(e) letter.

¶ 12     On January 31, 2014 M2Green notified Lexington of the 104(e) letter. Lexington paid only $5 million in coverage under the "each incident" limit or, in other words, Lexington provided coverage for only one "incident."

¶ 13     On February 21, 2014, which was during the Indian Harbor policy period, WestRock notified Indian Harbor of the 104(e) letter.

¶ 14     In May 2014 the EPA sent WestRock at "General Notice Letter." The General Notice Letter stated that based on WestRock's response to the 104(e) "information request letter" and other available information the EPA determined that WestRock "may be responsible under

---

[1]     Pursuant to section 104(e):

> "(2) Access to information
>         Any officer, employee, or representative described in paragraph (1) may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:
>         (A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.
>         (B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.
>         (C) Information relating to the ability of a person to pay for or to perform a cleanup." 42 U.S.C.A. § 9604(e)(2).

[CERCLA] for cleanup of the Site or costs the EPA has incurred or will incur in the future in cleaning up the Site." The letter explained that potentially responsible parties (PRPs) may be required to perform cleanup actions or pay costs for cleanup incurred by the EPA. The General Notice Letter encouraged communication and cooperation with other PRPs regarding the site.

¶ 15    In September 2014 the EPA sent WestRock a "Special Notice Letter." The Special Notice Letter stated that it followed the General Notice Letter in which the EPA notified WestRock "of its potential responsibility" under CERCLA. The letter stated that the EPA was now contacting WestRock "in an attempt to resolve its responsibility" at the site. The Special Notice Letter stated EPA's intention to perform a remedial investigation of the site. The Special Notice Letter invites the PRPs to negotiate a settlement to conduct or finance the remedial investigation and a feasibility study to evaluate clean-up options. If the parties are able to reach a settlement within the time allotted the "settlement will be embodied in an administrative order on consent (AOC)."

¶ 16    The Special Notice Letter states: "With this letter, the EPA demands that you reimburse the EPA for its costs incurred to date, and encourages you to voluntarily negotiate an AOC in which [WestRock] and other PRPs agree to perform the [remedial investigation and feasibility study.]" The letter listed the EPA's costs to date and stated, "Under Section 107(a) of CERCLA, the EPA hereby makes a demand for payment from [WestRock] and other PRPs for the above amount plus all interest authorized under Section 107(a)."

¶ 17    On July 28, 2024 Lauren Rosen, a Claims Counsel for Indian Harbor, emailed WestRock to confirm that Rosen had been assigned to handle the matter concerning the site. Rosen's email listed a claim number, a "claim filed" date of February 21, 2014, and a "claimant" as the EPA.

¶ 18    In November 2014 WestRock and other PRPs entered into an AOC with the EPA for a remedial investigation and feasibility study. The AOC states it is not an admission of liability,

and WestRock and the other PRPs "do not admit any liability *** arising out of any of the conditions related to the Site." WestRock retained the right to controvert in subsequent proceedings "the findings of fact, conclusions of law and determinations" in a latter section of the AOC. As it pertains to this appeal, the EPA's relevant conclusion of law was that WestRock and other parties to the AOC "are responsible parties under [sections] of CERCLA."

¶ 19    One of the stated purposes of the AOC is to "determine the nature and extent of contamination *** caused by the release or threatened release of hazardous substances, pollutants or contaminants at or from the Site" by conducting a remedial investigation. The AOC defines three "Operable Units." Relevant to this appeal, "Operable Unit 2" (OU2) means "the former industrial area of the Site, comprising approximately 225 acres" and "Operable Unit 3" (OU3) means "land formerly used for wastewater treatment and treated wastewater holding and solid waste storage, as well as Site-wide ground water containing or impacted by hazardous substances from Site activities. OU3 also includes locations in the Clark Fork River, where hazardous substances from Site activities have come to be located."

¶ 20    A "Remedial Investigation Work Plan" (Work Plan) is attached to the AOC. The Work Plan "documents the Site-specific objectives of the [remedial investigation] and a general management approach of the Site, including but not limited to, dividing the Site into three operable units (Ous)." The Work Plan states that, "The operation of the Mill is the primary source of [Constituents of Potential Concern] in OU2 soils. Releases associated with storage and use of chemicals in OU2 are the primary release mechanisms to OU2 soils;" and "The primary source of contamination to soils in OU3 is the historical use of OU3 for treatment and storage of wastewater and solid wastes."

¶ 21    On February 3, 2015, Rosen informed WestRock that Indian Harbor set a reserve amount of $100,000.

¶ 22    Indian Harbor denied coverage to WestRock on the grounds that WestRock did not provide notice of a claim in writing during the policy period or, alternatively, that any claim against the site was not first made against WestRock during the policy period. Indian Harbor contended that the 104(e) letter does not constitute a claim against WestRock or, alternatively, is not a claim first made against WestRock during the policy period that was reported in writing to Indian Harbor during the policy period.

¶ 23    WestRock filed a complaint for declaratory judgment as to the extent of Lexington's and Indian Harbor's coverage for the site (original complaint). The trial court granted WestRock leave to file a first amended complaint. WestRock's first amended complaint against Lexington in Count I sought a declaratory judgment on the number of "each incident" limits pursuant to Lexington's duty to indemnify. WestRock alleged that the EPA "is investigating the scope and nature of two distinct alleged Pollution Conditions that are not the same, related or continuous with respect to each other." The complaint alleged that Lexington "has a duty to indemnify" WestRock for the costs WestRock incurred in the investigation and defense of the "two distinct alleged Pollution Conditions that are not the same, related or continuous" and that there are two "each incident" limits available under the policy. Count II alleged that Lexington "has a duty to defend" WestRock and "reimburse the costs WestRock has incurred and will incur."

¶ 24    WestRock's first amended complaint against Indian Harbor sought a declaratory judgment on the number of Pollution Conditions pursuant to the duty to indemnify (Count III), and the duty to defend (Count IV).

¶ 25    Indian Harbor filed a motion for summary judgment on its counterclaim against WestRock on the grounds there is no claim first made and reported during the policy period and, therefore, WestRock is unable to meet Indian Harbor's policy's threshold requirements to recover under the policy. Indian Harbor argued that the 104(e) letter and General Notice Letter are not "claims," WestRock did not report the General Notice Letter within the policy period, and when the EPA issued the Special Notice Letter, the policy had already expired. In response, WestRock argued that the 104(e) letter is a claim as defined by the Indian Harbor policy and WestRock notified Indian Harbor of the "claim" in the 104(e) letter within the policy period. Alternatively, WestRock argued that the trial court should excuse WestRock for its delay in notifying Indian Harbor of the Special Notice Letter to avoid a forfeiture of WestRock's insurance benefits.

¶ 26    The trial court granted Indian Harbor's motion for summary judgment. The court found that the 104(e) letter did not fall within the definition of "claim" in the policy and that the late reporting of the Special Notice Letter could not be excused. The court also denied WestRock's request for discovery on its equitable argument.

¶ 27    On December 6, 2022, WestRock filed a motion for summary judgment against Lexington on Counts I and II of the first amended complaint. WestRock argued that it was "seeking a declaration that there are two distinct Pollution Conditions at the [site] and, thus, two Each Incident Limits are available to WestRock." WestRock argued that to determine the number of potential distinct Pollution Conditions the court must refer to "the mechanism and nature of discharge or release." The motion alleged that Lexington "has a duty to defend" WestRock for two distinct Pollution Conditions and to pay two "each incident" limits. WestRock argued that the "duty to defend standard is applicable to a Claim arising from a Special Notice

Letter." WestRock argued that the Special Notice Letter demonstrates that the EPA is "potentially investigating two distinct Pollution Conditions that are not the same, related or continuous." WestRock argued that the Pollution Conditions on OU2 and OU3 are not related because they have different causes and mechanisms. WestRock claimed that under the duty to defend standard it does not need to prove the actual number of distinct Pollution Conditions or incidents "because that would require determination of matters at issue in the underlying investigation." WestRock also argued that Lexington has a duty to indemnify WestRock for two distinct alleged Pollution Conditions and pay two "each incident limits."

¶ 28    Lexington filed a cross-motion for summary judgment arguing that, "Under the Policy, all discharges on or under the Site are 'Pollution Conditions' and all such Pollution Conditions that related to or continued from the operation of the Mill constitute one 'Incident.' " Lexington argued that under the plain meaning of "related" that term had to be given a broad meaning, and that here, "there is a direct and logical connection between the operation of the Mill and the pollution discharges being investigated." Lexington argued that requiring an analysis of the "mechanism" of the discharge "would constitute an impermissible rewriting of the plain language of the Policy." Finally, Lexington argued that because WestRock and the EPA resolved the EPA's "claim," "any defense obligation that may have existed under the Policy ended."

¶ 29    On August 14, 2023, the trial court granted Lexington's motion for summary judgment and denied WestRock's motion for summary judgment. The court held that "the evidence in the court record demonstrates that the pollution being investigated at the [site] is at least related and, thus, provides WestRock with only a single 'Each Incident Limit' under [the policy] issued by Lexington *** as that term ('Each Incident Limit') is used in the Lexington Policy."

¶ 30    This appeal followed.

¶ 31                                                    ANALYSIS

¶ 32     This is an appeal from a judgment on cross-motions for summary judgment in a

declaratory judgment action concerning insurance coverage. "Presumably, when parties file

cross-motions for summary judgment, they agree that no genuine issues of material fact exist and

that the dispute involves only questions of law, which the court may decide based on the record.

[Citation.] However, such a tacit agreement among the parties does not compel the court to

conclude that there is no issue of material fact." *Progressive Insurance Co. v. Universal Casualty

Co.*, 347 Ill. App. 3d 10, 17 (2004).

> "Summary judgment is appropriate only where the pleadings, depositions,
>
> admissions and affidavits, viewed in the light most favorable to the nonmovant,
>
> show that no genuine issue of material fact exists and that the moving party is
>
> entitled to judgment as a matter of law. [Citation.] *** Our review of an order
>
> granting summary judgment is *de novo.* [Citation.]" *Continental Casualty Co. v.
>
> Howard Hoffman & Associates*, 2011 IL App (1st) 100957, ¶ 27.

¶ 33     "The construction of the provisions of an insurance policy is a question of law, subject to

*de novo* review." *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d

407, 416 (2006). " 'The construction of an insurance policy and a determination of the rights and

obligations thereunder are *** appropriate subjects for disposition by way of summary

judgment.' [Citation.]" *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 27. Our supreme court

has instructed how to construct insurance contracts.

> "Insurance policies are subject to the same rules of construction applicable
>
> to other types of contracts. [Citation.] A court's primary objective is to ascertain
>
> and give effect to the intention of the parties as expressed in the agreement.

[Citation.] In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. [Citations.]

The words of a policy should be accorded their plain and ordinary meaning. [Citation.] Where the provisions of a policy are clear and unambiguous, they will be applied as written ([citation]) unless doing so would violate public policy ([citation]). That a term is not defined by the policy does not render it ambiguous, nor is a policy term considered ambiguous merely because the parties can suggest creative possibilities for its meaning. Rather, ambiguity exists only if the term is susceptible to more than one reasonable interpretation. [Citation.]

Because insurance contracts are issued under given circumstances, they are not to be interpreted in a factual vacuum. A policy term that appears unambiguous at first blush might not be such when viewed in the context of the particular factual setting in which the policy was issued. [Citation.] Governing legal authority must, of course, be taken into account as well, for a policy term may be considered unambiguous where it has acquired an established legal meaning. [Citation.] Where ambiguity does exist, the policy will be construed strictly against the insurer, who drafted the policy ([citation]), and liberally in favor of coverage for the insured ([citation])." *Nicor, Inc.*, 223 Ill. 2d at 416-17.

¶ 34    The trial court granted summary judgment in favor of Lexington and in favor of Indian Harbor on two wholly independent grounds. Therefore, we address each separately.

¶ 35                                    Lexington

¶ 36　The question as it relates to Lexington is whether one or two "each incident limits" is available for Lexington's coverage of WestRock. The parties agree that determination depends on the meaning of "related" in the Lexington policy. We necessarily begin with the language of the policy concerning the "each incident limit," which we must place in context. *American Zurich Insurance Co. v. Wilcox & Christopoulos, L.L.C.*, 2013 IL App (1st) 120402, ¶ 38.

¶ 37　The Lexington policy provides coverage for clean-up costs resulting from a Pollution Condition on the covered site and for a "loss" the insured is legally obligated to pay as a result of a claim for clean-up costs resulting from a Pollution Condition. A Pollution Condition is: "The discharge, dispersal, release or escape *** of any *** contaminant." The most Lexington will pay for all loss "arising from Each Incident *** is the 'Each Incident' limit of coverage." "Each Incident" is defined as "the same, related, or continuous Pollution Condition." In sum, Lexington is obligated to provide $5 million in coverage for each Pollution Condition—that is, each discharge, dispersal, release or escape of any contaminant—on the site up to $10 million *unless* multiple Pollution Conditions are the "same, related, or continuous." For multiple Pollution Conditions that are the same, related, or continuous, Lexington is only obligated to pay $5 million. The parties do not dispute that there are multiple Pollution Conditions on the site, those being Pollution Conditions on OU2 and OU3. The parties only dispute whether the Pollution Conditions are "related" (not whether they are the "same or continuous").

¶ 38　WestRock argues that the cause of the Pollution Condition is decisive of whether the Pollution Conditions are related. By "cause" WestRock means " 'the actual mechanism that led to' releases, not simply the source of the pollutants." WestRock argues that the Pollution Conditions on OU2 and OU3 are not "causally related." WestRock argues that "[t]he alleged releases of pollutants in OU2 and OU3 *** have separate and distinct causes, and are being

- 13 -

separately investigated and addressed by the PRPs at USEPA's direction, and under the causal connection test *** constitute separate 'Pollution Conditions' that are not the same, related or continuous." The two distinct causes, according to WestRock, are leaks and spills during manufacturing at the mill site (OU2) and intentional deposit of waste in storage ponds (OU3).

¶ 39    Lexington claims that WestRock has forfeited its sole argument on appeal. Lexington argues that WestRock did not argue that the Pollution Conditions are not the same, related, or continuous in an initial motion for summary judgment but raised that argument for the first time in its motion to reconsider. We reject Lexington's forfeiture argument for two reasons. First,

> "it has been held that an amendment complete in itself, which does not refer to or adopt the prior pleading, supersedes it and the original pleading ceases to be a part of the record, being in effect abandoned or withdrawn, with the result that the subsequent proceedings in the case are to be regarded as based upon the amended pleading, which will not be aided by anything in the prior pleadings. [Citations.]" *W. P. Iverson & Co. v. Dunham Manufacturing Co.*, 18 Ill. App. 2d 404, 425 (1958).

¶ 40    There is no dispute WestRock raised the issue of whether the Pollution Conditions were related to each other in its amended complaint and sought summary judgment on those grounds. Second, even if we were to find forfeiture, we would overlook it in this case for purposes of maintaining a uniform body of precedent.

> "Forfeiture *** is a restriction on the parties, not this court; we may overlook forfeiture, and we do so here. *Our Savior Evangelical Lutheran Church v. Saville*, 397 Ill. App. 3d 1003, 1028 (2009) ('forfeiture is a limitation on the parties, not on the court, and the court may overlook forfeiture where necessary to

obtain a just result or maintain a sound body of precedent')." *IRED Elmhurst, LLC*, 2021 IL App (2d) 200108, ¶¶ 48-49.

¶ 41    Turning to the merits, WestRock argues that, beginning with a case from Arizona, Illinois courts apply a causal connection test to the term "related" when that term is undefined in an insurance policy.

¶ 42    In *Arizona Property and Casualty Insurance Guaranty Fund v. Helme*, 735 P.2d 451 (1987), the Arizona Property and Casualty Insurance Guaranty Fund (the Fund) "brought a declaratory judgment action to limit its obligation to pay claims against [two] doctors" pursuant to professional liability insurance. *Helme*, 735 P.2d at 453. The Fund had a limit of liability for each "covered claim." *Id.* at 454. The first doctor performed a neurological consultation on the patient and either failed to read the patient's x-rays or failed to recognize the problem, "and thus did not diagnose or report a fracture dislocation of the spine." *Id.* at 458. The second doctor performed surgery on the patient and did not look at the x-rays before operating and therefore did not immobilize the patient during surgery, as he would have had he look at the x-rays and seen the fracture dislocation. *Id.* The claimants, the patient's survivors, sought to recover for "separate claims based on the separate acts of negligence of the two doctors." *Id.* at 454. The Fund took the position that "there had been only one 'occurrence' under the *** policy and, therefore, survivors could recover for only one 'covered claim.' " *Id.* The court of appeals held that the Fund was liable for only one occurrence because the negligence of the two doctors "constituted a 'series of related *** omissions.' " *Id.* The court of appeals found that the acts constituted a series of related omissions because "the wrongful death complaint 'asserted only one type of negligent conduct as it pertained to the continuous and ongoing patient care performed by

- 15 -

various parties,' " and because the "omissions of the two doctors were 'intimately related' and 'identical.' " *Id.* The Arizona Supreme Court disagreed. *Id.*

¶ 43    *Helme* found that for "occurrences" the policy employs a causal test, in that the question is "whether there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." (Internal quotation marks omitted.) *Id.* However, the policy modifies that test "by using the phrase 'series of related' acts or omissions." *Id.* Thus, under the policy, "a 'series of related' causes of an injury merge to constitute only one 'occurrence.' " *Id.* The policy did not define the word "related," and the court's research failed to reveal any generally accepted legal meaning. *Id.* The *Helme* court stated that it would "assume that the policy uses 'related' in its commonly accepted dictionary sense." *Id.* The court found: "Webster's dictionary defines the intransitive verb 'relate' as 'show[ing] or establish [ing] a logical or causal connection between.' [Citation.] A 'related' act or omission, therefore, is one that has a logical *or* causal connection with another act or omission." *Id.*

¶ 44    However, the *Helme* court found that it could not equate the word "related" as used in the policy with the phrase "logical connection." *Id.* The court reasoned that "logic" is subjective; and "[i]ncidents may be 'logically related' for a wide variety of indefinable reasons. Causal connection depends, to a much greater extent, on objective facts in the record." *Id.* The court concluded that applying the dictionary definition of "related" would render the policy ambiguous and, for that reason, the court would have to find in favor of the claimant. *Id.* Rather than finding in favor of the claimant because of an ambiguous policy term, the *Helme* court stated that its preferred approach was "to determine the meaning of a clause which is subject to different interpretations or constructions by examining the purpose of the clause, public policy considerations, and the transaction as a whole." *Id.* at 457.

¶ 45    The court found a correlation between the phrase "series of related acts or omissions" and "causation" from other multiple-act cases interpreting that phrase when not expressly defined in an insurance policy. *Id.* The court concluded that, "These cases compel the conclusion that the number of causative acts, and not the number of injuries produced, is the key to interpreting 'per occurrence' clauses" and determining the number of occurrences. *Id.* The court found that although multiple acts causing a single injury will constitute multiple occurrences, and a single act will constitute a single occurrence even if it produces multiple injuries, the use of the word "related" in the phrase "series of related acts" excludes "*causally related* acts" from the rule that multiple causative acts constitute multiple occurrences. *Id.* The court held that the proper construction of the contract meant that "even though there have been multiple causative acts, there will be a single 'occurrence' if the acts are causally *related to each other* as well as to the final result." (Emphasis in original.) *Id.* at 458.

¶ 46    The *Helme* court did not expressly define what makes acts "causally related." However, its opinion strongly suggests that to be "causally related" one act must be the "cause" of the second act. The court found that, "Each of the diagnostic failures allegedly was a cause of injury and contributed to the ultimate result—death. The doctors' failures clearly were separate causal acts of separate doctors on separate days. *Nothing in the record indicates that [the consulting doctor's] conduct caused [the surgeon] to fail to examine the x-rays.* Certainly, on this record the finder of fact could not find a causal connection." (Emphasis added.) *Id.* See also *Gregory v. Home Insurance Co.*, 876 F.2d 602, 605 (7th Cir. 1989) (discussing *Helme* and finding that "it appears *Helme* requires a causal connection in the sense that one error caused the other"). The *Helme* court held, therefore, that the trial court did not err in holding that the doctors' omissions

constituted two occurrences under the policy and that the survivors could recover for two covered claims. *Id.*

¶ 47    WestRock cites several decisions from foreign jurisdictions that have followed *Helme*. In direct support of its argument that Illinois applies the "causally connected" test to the term "related" when that term is undefined in an insurance policy, WestRock relies on the decision of the Fourth District of this court in *Village of Camp Point v. Continental Casualty Co.*, 219 Ill. App. 3d 86 (1991) (*Camp Point*). In *Camp Point*, the trial court found coverage for one "occurrence" because "the work performed by [an attorney] *** was all the result of the written employment contract ***, and while separate acts were performed by [the attorney] over a several year period, the acts or omissions were all 'related' within the meaning and intent of the subject insurance policy." (Internal quotation marks omitted.) *Id.* at 97. On appeal, the question was "how many 'occurrences" were involved." *Id.* at 98. The *Camp Point* court recognized that "the 'series-of-related-act' language in the policy may well cover what would otherwise appear to be separate transactions." *Id.*

¶ 48    *Camp Point* quoted *Helme* extensively; but the *Camp Point* court did not state explicitly whether the multiple negligent acts had to be "causally related" or "logically related" to constitute a "series of related errors." Rather, the court found that the record demonstrated only one "general characterization of injury" but, within that general characterization were four specific injuries to the plaintiff. *Id.* at 102-03. The court found that it was incorrect to determine that the negligence was the rendering of legal advice which the attorney thought was correct and instead the court had to look to the acts of negligence. *Id.* at 103. The court found that the evidence pointed to the drafting of multiple documents for the plaintiff, and found that every time the attorney "rendered legal services knowing his activities contravened the relevant legal

principles is a separate cause for an injury." *Id.* at 103. Although not expressly stated, it appears the court applied the causally related test as described in *Helme* to determine whether the multiple causative acts by the attorney were causally related to each other. The *Camp Point* court found that there were four separate occurrences resulting in four "separate and distinct" injuries. *Id.* at 103. The court then found that, "The cause of none of the injuries flows naturally through the preceding event." *Id.* at 103. This finding comports with the view that *Helme* found that for multiple incidents or occurrences to be "related" the cause of each must be related to each other in that one "cause" *resulted in* the second "cause."

¶ 49    In *Doe v. Illinois State Medical Inter-Insurance Exchange*, 234 Ill. App. 3d 129 (1992) (*ISMIE*), the relevant issue was whether a doctor's "several acts of medical negligence" were "separate and discrete" for purposes of the aggregate limits of policy coverage. *ISMIE*, 234 Ill. App. 3d at 130-31. The policy provided that "all personal injuries sustained by one or more persons arising out of a single act or omission or a *series of related* acts or omissions *** shall be considered one claim." (Internal quotation marks omitted.) *Id.* The *Doe* court found that the "related acts" provision of the policy was ambiguous in part because "the term 'related' is not defined in the policies and has no generally accepted legal meaning." *Id.* at 137. Nonetheless, in a footnote, the *Doe* court cited *Helme* for the proposition that " 'Related Act' has been interpreted to mean 'causally connected' rather than 'logically connected,' thereby dependent upon objective facts rather than subjective mental processes." *Id.* at 137 n3 (quoting *Helme*, 735 P.2d 451).

¶ 50    The court found that, "It is the causative events producing the damage that constitute actionable conduct, not the number of injuries." *Id.* at 140. The *Doe* court found that the doctor committed separate acts of negligence in the second policy period from those committed during

the first policy period, and the negligent acts committed during the second policy period were separate from each other, all of which gave rise to several claims under the second policy. *Id.* Again, although not expressly stated, the *Doe* court apparently applied the "causally related" test as stated in *Helme* to the several negligent acts during the second policy period, which the court found to be separate from each other. See *id.* ("Dr. Magsaysay did not have John fed by mouth [(a latter act of negligence during the second policy period)] because he failed to properly prescribe and monitor certain drugs given him months before [(a former negligent act during the second policy period)]; it was because he failed to treat a new condition properly.").

¶ 51    WestRock also cites *Pennzoil-Quaker State Co. v. American International Specialty Lines Insurance Co.*, 653 F. Supp. 2d 690 (S.D. Tex. 2009) (*Pennzoil*) in support of the "causally related" test for whether claims are "related" for purposes of determining liability limits. *Pennzoil* found that "[b]ecause 'related' is undefined in the Policy, its ordinary meaning—having a logical or causal connection—applies." *Id*. at 707. *Pennzoil* found that "the cases teach that in determining whether there are multiple liability-triggering events and therefore more than one deductible, the court is not to look to an 'overarching cause,' but rather to the specific events that allegedly give rise to the insured's liability." *Id*. at 707. The court stated that "the facts alleged in the underlying suits in this case involve two discrete events *** and long-term continuous releases of two different kinds of pollutants." *Id*. at 708. The court found that the "arguments for viewing all of the pollution releases and emissions alleged in the underlying suits as a single related 'Pollution Condition' are unsupported by the pleadings in the underlying cases and by the applicable law." *Id*. at 707.

¶ 52    However, we believe the court conflated the test for whether there are multiple occurrences with the test for whether multiple occurrences are related. Despite acknowledging

- 20 -

that "related" means having a logical or causal connection, even if arguably the court found the occurrences were not causally connected, the court never discussed whether the separate occurrences had a "logical" connection. The court held that "it cannot conclude as a matter of law that there was a *single related* Pollution Condition." *Id*. at 708. We believe this holding evinces the court's confusion. In that case, the deductible amount applied "to all Clean–Up Costs, or Loss arising from the same, related or continuous Pollution Conditions." (Emphasis omitted.) *Id*. at 694. Although stated separately, the court's holding treats "same" and "related" as a single inquiry. However, "under Texas law, insurance policies are interpreted using the ordinary rules of contract interpretation, with all terms read together and each clause and word given effect." *Westchester Surplus Lines Insurance Co. v. Maverick Tube Corp.*, 722 F. Supp. 2d 787, 794 (S.D. Tex. 2010).

¶ 53    Regardless, this court has rejected application of just the "causally related" test to the term "related" when that term is *not* defined in an insurance policy, and has found that the proper test is found in plain meaning of the word "related," which is whether the claims are "logically or causally related." In *Howard Hoffman*, 2011 IL App (1st) 100957, the insurer sought a declaration that its obligation to the defendant-insureds was limited by a policy limit for multiple claims that are related rather than the aggregate limit for multiple claims that are not related. *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 1. The policy provided that, "If related claims are subsequently made against the insured *** all such related claims *** shall be considered a single claim ***." *Id.* ¶ 7. The policy in *Howard Hoffman* defined "related claims" in part as "related acts or omissions," and defined "related acts or omissions" as acts or omissions "that are temporally, *logically, or causally* connected by any common fact, circumstance, situation, transaction, event, advice or decision." (Emphasis added.). *Id.* The *Howard Hoffman* court found

that the concerns as to "logical connection" expressed in *Helme* as quoted in *Camp Point* were not persuasive for finding an ambiguity in the policy before the court, relying in part on the fact the policy before the court specifically defined a related claim or occurrence to include the concept of a logical connection. *Id.* ¶ 34.

¶ 54 The specific holding in *Howard Hoffman* is that the definitions of "related claims" and "related acts or omissions" in the policy are not ambiguous just because they include the concept of a logical connection. *Id.* ¶ 38. Despite its reliance on the definition of related claims in the policy, that court also found that, "even assuming that the *Camp Point* decision can be seen as endorsing the notion that a 'logical' connection should not be incorporated into the concept of relatedness in insurance policies, we find that any such reasoning has been persuasively rejected in several subsequent decisions from other courts." *Id.* ¶ 35 (citing "*Continental Casualty Co. v. Wendt,* 205 F.3d 1258, 1262-63 (11th Cir. 2000) (*per curium* ) ('the plain meaning of the word "relate" is "to show or establish a logical or causal connection between" ') (quoting district court opinion); *Gregory v. Home Insurance Co.,* 876 F.2d 602, 606 (7th Cir.1989) (same); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.,* 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263, 1274 (1993) (same).").

¶ 55 In *Gregory*, 876 F.2d 602, the Seventh Circuit addressed the term "related" when not defined in the policy. The court agreed with the district court, which had considered *Helme* in its decision, that an attorney's negligent acts giving rise to distinct claims, were "all 'related' in any meaningful sense of the term." *Id.* at 605-06 and n4. In reaching its decision, the *Gregory* court observed:

> "We agree with the *Helme* court that the common understanding of the
>
> word 'related' covers a very broad range of connections, both causal and logical.

However, we don't think the rule requiring insurance policies to be construed against the party who chose the language requires such a drastic restriction of the natural scope of the definition of the word 'related.' Parties are generally free to include language of their choice in contracts, and courts should refrain from rewriting them. [Citation.] At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play. The facts of this case, though, as concisely explained by Judge Dillin, comfortably fit within the commonly accepted definition of the concept." *Gregory*, 876 F.2d at 606.

¶ 56    WestRock argues that the Seventh's Circuit's subsequent decision in *USA Gymnastics v. Liberty Insurance Underwriters, Inc.*, 27 F.4th 499, 507 (7th Cir. 2022), abrogates its holding in *Gregory*. Rather than limiting *Gregory*, the *USA Gymnastics* court followed *Gregory*'s admonition that in some instances, depending on the particular facts of the case, "a logical connection may be too tenuous reasonably to be called a relationship." It is clear that the decision in *USA Gymnastics* is based on the unique facts of that case. See, *e.g*., *id.* at 525 ("This case is in the grey territory where the policy's broad language becomes ambiguous as applied to these unique facts."). Another factor distinguishing *USA Gymnastics* from this case is the fact that the court was "not interpreting policy limits *** , but rather a complete exclusion of coverage, where the demands for clarity are greatest." *Id.* at 525. This case involves policy limits, not a complete exclusion of coverage.

¶ 57    Requiring multiple Pollution Conditions to be unrelated to avoid the application of one "each incident" limit does not "read[] the potential for multiple 'Incidents' out of the Policy;" it merely respects the language in the parties' agreement. Here, the parties agreed to one coverage

limit for "related" claims. This court will not rewrite the parties' bargained for agreement as expressed in the plain language of the policy. *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 78, see also *Porterfield v. Truck Insurance Exchange*, 28 Ill. App. 2d 195, 199 (1960) ("It is the function of the court to construe a policy as it is written. We cannot rewrite a policy to enforce liability where the clear terms of the policy exclude or limit it.").

¶ 58    We agree with *Howard Hoffman* and *Gregory* that the plain, ordinary, dictionary definition of "related" is not ambiguous in this context and, under our rules for construing insurance contracts, must be employed in this case. See also *Wendt*, 205 F.3d at 1262–63 (finding that courts are "not in agreement as to the term's ambiguity" but finding "most persuasive *** the Seventh Circuit decision in *Gregory*."). The *Wendt* court found that,

> "The words 'relate' or 'related' are commonly understood terms in everyday usage. They are defined in the dictionary as meaning a 'logical or causal connection between' two events. [Citation.] There is no ambiguity unless one is *created* through the device of simply ignoring one half of the definition. This is essentially the flaw in the reasoning of the Arizona court in *Helme, supra,* as recognized in *Gregory.*" *Id.*

¶ 59    WestRock complains that neither *Gregory* nor *Wendt* applied Illinois law. WestRock does not specify, nor do we find, any meaningful difference between our law and the law applied in *Gregory* and *Wendt*. Nor do we rely on reasoning that rests on policy definitions of "related" that include "logically connected." See *supra*, ¶ 54 (discussing *Howard Hoffman*). Furthermore, we find that our supreme court's decision in *Nicor* does not preclude this court from holding that when undefined in an insurance policy the term "related" shall be given its plain and ordinary meaning of logically or causally connected.

¶ 60    In *Nicor*, our supreme court had to determine whether multiple acts committed over multiple years for the replacement of gas meters (which in some cases resulted in the spilling of Mercury) that resulted in injuries to the parties who had their meters replaced were multiple "occurrences" as that term was defined in Nicor's liability insurance policies. The court held that Illinois uses the "cause theory" to determine the number of occurrences. *Id.* at 420. Under that approach, "the number of occurrences is determined by referring to the cause or causes of the damages." *Id.* at 419. The *Nicor* court held that liability did not, as Nicor argued, arise from "the overall costs of investigating and remediating the spills" and thus a single cause. *Id.* at 435. The court held that each spill constituted a separate occurrence. *Id.* at 440.

¶ 61    *Nicor* did not construe the meaning of the term "related" when undefined in an insurance policy nor did it address any question as to whether the Mercury spills in *Nicor*, though separate occurrences, were "related." WestRock's implication that *Nicor* approves *Camp Point*'s finding—if *Camp Point* does make the finding, which is unclear from the opinion[2]—that "related" as it pertains to separate claims means "causally related" but, more importantly, does *not* mean "logically related," stretches disparate portions of both cases out of their original context to the bounds of probity. *Nicor* is simply inapposite to the question before this court and, therefore, does not control our holding.

¶ 62    Before we apply our findings to the facts of this case, we note that *Gregory* and *Howard Hoffman* recognized, as stated in *USA Gymnastics*, that there would be an "outer bounds of

---

[2]    Despite its lengthy quotation from *Helme*, and its apparent application of the "causally related" test for related claims, *Camp Point* does not explicitly disavow the "logically related" test for related claims. See also *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 34 ("the extent to which the *Camp Point* decision actually relied upon this exact portion of the very lengthy citation to *Helme* is unclear, as this specific reasoning is never discussed in the Illinois court's analysis.").

'relatedness.' " *USA Gymnastics*, 27 F.4th at 526, see *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 68. The *USA Gymnastics* court held that, " 'In any way related' is too ambiguous—as applied to these very different facts—to exclude coverage ***." *Id.* at 528. We find this holding in no way represents a "backtracking" from *Gregory*, and given its limitation to its unique facts, has no application in this case. In this case, we have no need to "dwell upon or define the outer limits of the policy's *** "Related claims" provisions to resolve the issues before this court." *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 68.

¶ 63    To determine whether the Pollution Conditions are "related" so that only one "each incident limit" applies, we look to the plain, ordinary, dictionary meaning of "related," which means "logically or causally connected." *Camp Point*, 219 Ill. App. 3d at 99–100 (quoting *Helme*, 735 P.2d at 456-58, quoting Webster's Third New International Dictionary Unabridged, at 1916 ("A 'related' act or omission, therefore, is one that has a logical *or* causal connection with another act or omission.")) (Emphasis in original.)

"According to Black's Law Dictionary, (5th Ed.1979), the word means [s]tanding in relation, connected; allied; akin. Webster's Third New International Dictionary (1981) defines related as having relationship: connected by reason of an established or discoverable relation. and defines relation as an aspect or quality (as resemblance, direction, difference) that can be predicated only of two or more things taken together: something perceived or discovered by observing or thinking about two or more things at the same time: connection." (Internal quotation marks omitted.) *Gregory*, 876 F.2d at 606 n5.

" 'Logically' can [also] be defined as 'of or relating to logic,' which in turn is defined as the 'interrelation or connection or sequence (as of facts or

events) especially when seen by rational analysis as inevitable, necessary, or predictable.' [Citation.] Finally, 'casually' is defined as 'expressing or indicating cause,' while a 'cause' is defined as 'a person, thing, fact, or condition that brings about an effect' or 'the necessary antecedent of an effect.' [Citation.]" *Howard Hoffman*, 2011 IL App (1st) 100957, ¶ 60.

¶ 64    Applying these definitions to the facts of this case, we find that the Pollution Condition on OU2 caused by leaks and spills during the manufacturing process is "related" to the Pollution Condition on OU3 caused by the depositing of waste from the manufacturing process into storage ponds. The relationship between the two Pollution Conditions is both established and discoverable, and their interrelation is both predictable and inevitable. The manufacturing process would necessarily produce waste and there would predictably be leaks and spills during that process. We do not dispute, and neither does Lexington, that there are two Pollution Conditions on the site because they have different causes: manufacturing and waste disposal. Our holding is that those conditions are related to each other and the pollution. See *Lloyd's Syndicate 3624 v. Biological Resource Center of Illinois, LLC*, 341 F. Supp. 3d 841, 845 (N.D. Ill. 2018) (recognizing "the breadth of the term 'related,' as interpreted in Illinois and by the Seventh Circuit").

¶ 65    We allowed United Policy Holders to file a brief as *amicus curiae* in support of WestRock. United argues that the trial court's interpretation of "related" is "so expansive" that it renders the aggregate limit of coverage in the policy meaningless and fails to give meaning to all of the words in the policy. United also argues that "related" is ambiguous and should be construed in favor of coverage. United argues the broad interpretation of related means that WestRock "could never receive coverage for more than one 'Incident,' since the Lexington

Policy insures only a single site, and so all resulting pollution must originate from the operation of the mill in some way." We disagree. Construing "related" with its plain and ordinary meaning, we concede the use of the term has broad affect. However, as we have recognized, its reach is not unlimited. Moreover, our construction of related leaves room for coverage for "unrelated" Pollution Conditions on the site which, however hypothetical now, could reasonably have existed.

¶ 66     United also argues that a broad interpretation of "related" contravenes WestRock's reasonable expectations. However, in the authority on which United relies, the court recognized that, "The parties' intentions must be enforced as written unless they are ambiguous or enforcement would contravene public policy." *Whitt v. State Farm Fire & Casualty Co.*, 315 Ill. App. 3d 658, 662 (2000). We agree that an insurance policy cannot be read in a vacuum, and that the parties' reasonable expectations are not irrelevant; but in this case, we have found, and United has not persuaded us otherwise, that the language in the policy is unambiguous and must be enforced as written. See Restatement of the Law of Liability Insurance § 3 (2019) ("The courts in most states currently employ the doctrine only as a guide to the interpretation of ambiguous terms."), *Smagala v. Owen*, 307 Ill. App. 3d 213, 219 (1999) ("In light of our holding that the terms of the insurance policy are not ambiguous, the reasonable expectations test is inapplicable to the case at bar."). The fact that the EPA identified two *separate* Pollution Conditions does not affect the analysis of whether they are *related*, as those terms have different meanings in this context. Finally, whatever foreign authority the trial court relied on is irrelevant; our review was *de novo*.

¶ 67     Finally, WestRock invokes Lexington's duty to defend it during the EPA's investigation and argues that, given that duty, "Lexington cannot win a judgment limiting its coverage as long

as the investigation may find 'Pollution Conditions' that are not 'related.' " Lexington responds the AOC settles EPA's claim; therefore, there is nothing left to defend. WestRock refutes that assertion, arguing that the AOC did not resolve the EPA's claim because the Special Notice Letter "asserted liability 'for the costs of cleaning up the Site' " and, according to WestRock, the AOC "concerns only reimbursing prior USEPA costs and preparing and performing 'a remedial investigation.' " WestRock contends that under the AOC it does not admit cleanup liability, concede any release of hazardous substance, or surrender the right to contest the findings of fact in the AOC. WestRock also cites *Continental Casualty Co. v. Grossman*, 271 Ill. App. 3d 206, 209 (1995). In *Grossman*, the court held that "to declare a limit on policy coverage prior to trial on the underlying complaint *** the court must find that no possible factual findings at trial on the underlying complaint could lead to liability in excess of the declared limit." *Grossmann*, 271 Ill. App. 3d at 209. The *Grossman* court found that because the complaint could support finding unrelated wrongful acts giving rise to separate claims, the trial court could not, before trial, establish the limit of the insured's liability. *Id.* at 212-13.

¶ 68 Lexington argues that although there are multiple Pollution Conditions on the site, "the multiple 'pollution conditions' at issue are the same, related, or continuous and comprise a single 'each incident.' " Lexington argues that, given that it has paid one "each incident" limit, "which is now exhausted, Lexington owes no further duty to defend or indemnify West Rock."

¶ 69 Lexington's policy provides coverage for expenses for the investigation and removal of contamination ("Clean-Up Costs") resulting from a Pollution Condition; and for "loss" (including Clean-Up Costs and costs incurred in the investigation of "Claims for *** Clean-Up Costs") that WestRock is legally obligated to pay "as a result of a Claim for Clean-Up Costs resulting from a Pollution Condition." A "claim" is "a written demand *** alleging liability ***

and seeking a remedy" for Clean-Up Costs, among other items. Only a "Claim for Clean-Up Costs" is at issue in this case; there is no suggestion WestRock independently discovered and reported a Pollution Condition for which it incurred or might incur Clean-Up Costs. The "claim" (*i.e.*, "complaint") in this case is the Special Notice Letter from the EPA. (This conclusion will be discussed in greater detail in the next section this order.)

¶ 70     We find, applying the rationale from *Grossman* to this case, that if WestRock faces potential Clean-Up Costs or costs to investigate a claim for Clean-Up Costs (a "loss") from the Special Notice Letter for an unrelated discharge, dispersal, release, or escape of a contaminant, hazardous substance, or waste materials ("Pollution Condition") on the site, then Lexington may still be liable for another "each incident" limit of liability; and, consequently, its exhaustion of one "each incident" limit would be irrelevant. On the other hand, if, as Lexington argues, the AOC resolved all of WestRock's potential loss from the Special Notice Letter, then, because we have found that the AOC describes only "related" Pollution Conditions (because OU2 and OU3 are the only relevant Pollution Conditions), Lexington's liability to WestRock, including under its duty to defend, is exhausted.[3] We find that the AOC resolves the EPA's claims against WestRock stated in the Special Notice Letter.

¶ 71     The Special Notice Letter begins that it is "an attempt to resolve [WestRock's] responsibility at the Site." The letter seeks to "facilitate a settlement between" WestRock and the EPA "for performance of a [remedial investigation/feasibility study] at the Site." The letter

---

[3]     The duty to defend provision in the policy reads, in pertinent part, as follows:
    "When a Claim is made against the Insured to which [the applicable coverage] applies ***the Company has *** the duty to defend such Claim, even if groundless, false, or fraudulent. *** The Company shall not be obligated to defend or continue to defend any claim after the applicable limit of liability has been exhausted by payment of Loss."

specifically demands reimbursement for the EPA's costs to date and seeks to recover "its ***

costs" incurred in response to conditions at the Site and "all the interest authorized to be

recovered."

¶ 72     The AOC is the "settlement" the EPA sought in the Special Notice Letter. The AOC

provides that WestRock is "liable for carrying out all activities required by this Settlement

Agreement." The purpose of the AOC is to "recover response and oversight costs incurred by the

EPA with respect to this Settlement Agreement, as well as Past Response Costs." Under the

AOC WestRock "shall" conduct the remedial investigation. The purpose of the remedial

investigation is to collect data to characterize site conditions, determine the nature and extent of

the contamination at or from the Site, and assess the risk to human health. If the EPA determines,

after the remedial investigation, that a feasibility study is required (due to "releases or potential

releases of hazardous substances"), then WestRock agrees to prepare the feasibility study "in

addition to those actions required by the initially approved [remedial investigation] Work Plan."

The Work Plan "documents the Site-specific objectives of the [remedial investigation] and a

general management approach for the Site, including *** dividing the Site into three operable

units (Ous)." (Only OU2 and OU3 are at issue.) The feasibility study must "determine and

evaluate *** alternatives for remedial action to prevent, mitigate or otherwise respond to or

remedy the release or threatened release of hazardous substances, pollutants, or contaminants at

or from the Site." Under the AOC, WestRock is obligated "to take any action required by the

plan, report or other deliverable, as approved or modified by the EPA." WestRock is also

obligated to pay past and future response costs.

¶ 73     We find that the AOC provides for every claim stated in the Special Notice Letter.

WestRock has not identified any specific additional potential loss from the claims in the Special

Notice Letter. We find that the Special Notice Letter only makes WestRock liable to complete a remedial investigation and feasibility study and to pay the EPA's costs incurred. The AOC requires WestRock to complete the studies and pay the costs. The provision in the AOC reserving WestRock's right "to controvert *** the validity of [certain] findings of fact, [and] conclusions of law" does not mean that there may be an additional unrelated loss from the claim at issue. The findings of fact and conclusions of law that WestRock may controvert in a subsequent proceeding, "other than proceedings to implement or enforce [the] Settlement Agreement," are historical facts that WestRock has admitted in these proceedings, and, with one possible exception, the conclusions of law do not impact WestRock's liability. The only conclusion of law that might impact liability, that WestRock is "a responsible party" under CERCLA has, once again been admitted. We also find that by entering the settlement and agreeing to the Work Plan, WestRock has also conceded that "[t]he actions required by the Settlement Agreement are necessary to protect the public health, welfare or the environment, are in the public interest, *** and will expedite effective remedial action ***."

¶ 74    Lexington has paid its limit of coverage for the one "incident" comprising multiple related Pollution Conditions; therefore, is liability and duty to defend are exhausted.

¶ 75    For all of the foregoing reasons, we affirm the trial court's judgment granting summary judgment in favor of Lexington.

¶ 76                                Indian Harbor

¶ 77    WestRock argues that it reported a "Claim" that was made during the Indian Harbor Policy Period to Indian Harbor within the policy's reporting period, therefore it is entitled to coverage under the Indian Harbor Policy. Indian Harbor provided coverage to WestRock for loss

and related legal expense resulting from any Pollution Condition on the site which WestRock became obligated to pay as a result of

"a CLAIM first made against the INSURED during the POLICY PERIOD and reported to the Company, in writing, by the INSURED, during the POLICY PERIOD or, where applicable, the EXTENDED REPORTING PERIOD."

¶ 78   The Indian Harbor Policy defines "claim" as follows:

"CLAIM means any demand(s), notice(s) or assertion(s) of a legal right alleging liability or responsibility on the part of the INSURED and shall include but not be limited to lawsuit(s), petitions(s), order(s) or government and/or regulatory action(s), filed against the INSURED."

¶ 79   The Indian Harbor policy does not define "liability" or "responsibility." "When insurance policies do not define terms, courts give them their plain, ordinary, and popular meanings, looking to their dictionary definitions." *Illinois Union Insurance Co. v. Medline Industries, Inc.*, 2022 IL App (2d) 210175, ¶ 60. "Liability" is defined as "something for which one is liable especially: pecuniary obligation." (https://www.merriam-webster.com/dictionary/liability (visited September 19, 2024)). "Liable" means "obligated according to law or equity: responsible." (https://www.merriam-webster.com/dictionary/liable (visited September 19, 2024)). "Responsibility" means "something for which one is responsible." (https://www.merriam-webster.com/dictionary/responsibility (visited September 19, 2024)). "Responsible" means "liable to be called to account as the primary cause." (https://www.merriam-webster.com/dictionary/responsible (visited September 19, 2024)).

¶ 80   WestRock argues that the 104(e) letter meets the definition of a "Claim" because the letter demanded, notified of and asserted a "legal right" to impose a "responsibility" on

WestRock to provide information to support WestRock's potential liability for a Pollution Condition. Further, the letter subjected WestRock to penalties for failing to provide that information.[4] WestRock argues that the Indian Harbor policy defines "Claim" broadly to include any effort to impose a responsibility on the insured and the policy does not require a demand for money.

¶ 81     To satisfy the definition of a "Claim," the demand, notice or assertion must assert that the insured is liable or responsible for something. Indian Harbor argues that something is a covered loss; in this case, a *Claim* for remediation expense and related legal expense resulting from a Pollution Condition or loss and related expense from a Pollution Condition. Indian Harbor argues the 104(e) letter does not allege liability or responsibility for remediation or clean-up at the site. Indian Harbor disputes the implication that 104(e) letters are *de facto* notices of liability because the 104(e) letter does not mention potential liability; under section 104 the EPA may request information from any person with relevant information, not just a PRPs; 104(e) letter are investigatory tools used before a violation has been identified; and such letters are typically issued during the PRP search process, "before PRPs have been identified, much less notified of liability."

---

[4]     The 104(e) letter contains a provision that reads:

> "Failure to respond fully and truthfully, or to adequately justify your failure to respond, can result in an enforcement action by the EPA, pursuant to section 104(e) of CERCLA and the imposition of penalties of up to $37,500 per day of non-compliance. Please be further advised that provision of false, fictitious, or fraudulent statements or representations may subject you to criminal penalties under 18 U.S.C. § 1001."

¶ 82     A "claims made and reported" policy such as Indian Rock's "requires not only that the claim be first made during the policy period, but also that it be reported to the insurer during the policy period. [Citations.]" *Uhlich Children's Advantage Network v. National Union Fire Co. of Pittsburgh, PA*, 398 Ill. App. 3d 710, 715 (2010). "[T]he reporting period defines coverage under a claims-made policy." (Internal quotation marks omitted.) *James River Insurance Co. v. TimCal, Inc.*, 2017 IL App (1st) 162116, ¶ 29.

> "In the case of a 'claims-made' policy *** notice *** constitutes the event that triggers coverage. [Citation.] Courts strictly interpret the notice provisions in a 'claims-made' policy. [Citation.] A notice provision requiring that a claim be reported to the insurer during the policy period or within a specific number of days thereafter 'define[s] the scope of coverage by providing a certain date after which an insurer knows it is no longer liable under the policy.' [Citation.] *** [The] reports are 'considered essential to coverage' such that 'an insurer need not demonstrate prejudice to deny coverage when an insured does not give notice within the policy's specified time frame.' [Citation.] Allowing coverage beyond that period would grant the insured more coverage than he bargained and paid for and would require the insurer to assume coverage for risks for which it had not bargained. [Citations.]" *Pennzoil*, 653 F. Supp. 2d at 697-98.

¶ 83     The 104(e) letter begins by stating that it is regarding a "Request for Information." The letter states that it seeks the recipient's "cooperation in providing information and documents." The letter goes on to say that the EPA is "investigating" pollution at the site and "the ability of persons to pay for or to perform a cleanup at the Site." The letter requests WestRock respond to an information request included with the letter; and informs WestRock that the EPA is writing to

it "because we have information that [WestRock's predecessors] operated portions of property comprising the Site." The letter asks WestRock to "Please respond *** within 30 days."

¶ 84     We find that the 104(e) letter does not demand, provide notice, or assert any "liability" or "responsibility" on the part of WestRock. There is no "demand," as the letter is a request. The letter does not assert or notify WestRock of any pecuniary obligation nor of any legal or equitable obligation. The letter does warn WestRock of certain consequences of failure to respond, notably that a failure to respond "*can* result in an enforcement action by the EPA." (Emphasis added.) The fact that failure to respond may result in an enforcement action is not the same as an existing legal obligation. The criminal penalties are penalties for lying to the government, not for failing to comply with the 104(e) letter. See 18 USC § 1001 (Fraud and False Statements). The letter does not state anything for which WestRock will be called to account. Based on its plain language, the 104(e) letter is not a "Claim" within the meaning of the Indian Harbor policy. See *Home Insurance Co. of Illinois (New Hampshire) v. Spectrum Information Technologies., Inc.*, 930 F. Supp. 825, 846 (E.D.N.Y. 1996) ("Courts have found that the term 'claim' as used in liability insurance policies is unambiguous and generally means a demand by a third party against the insured for money damages or other relief owed." (listing cases)).

¶ 85     In support of its position WestRock cited a decision from the Ninth Circuit. We acknowledge that court's observation that 104(e) letters "are not normal demand letters. They are formal steps in a legal process administered by the EPA that inexorably leads to the EPA seeking to hold property owners strictly liable for environmental contamination." *Anderson Brothers,*

*Inc. v. St. Paul Fire & Marine Insurance Co.*, 729 F.3d 923, 934 (9th Cir. 2013). Nonetheless, we find the decision inapposite and the comment, in context, unpersuasive.[5]

¶ 86     WestRock also cited a decision from the federal district court for the Northern District of Illinois applying Illinois law. In *Richardson Electronics, Ltd. v. Federal Insurance Co.*, 120 F. Supp. 2d 698 (N.D. Ill. 2000) (*Richardson*), the United States Department of Justice began to investigate antitrust charges against the insured and served a "Civil Investigative Demand" on Richardson "with various interrogatories, and also subpoenaed many documents and much personal testimony." *Id*. at 700. The insurer argued that an antitrust investigation did not constitute a claim under the terms of the policy. *Id.* at 701. The court applied Illinois law applying the dictionary definition of "claim" to a "claims made" provision in an insurance policy. *Id.* (citing *Central Illinois Public Service Co. v. American Empire Surplus Lines Insurance Co.*, 267 Ill. App. 3d 1043 (1994) (*CIPS*)). The dictionary defined "claim" to mean " 'a demand for something due or believed to be due;' " and the *CIPS* court also wrote that, "The term 'claim' in a policy was in the nature of an actual demand for something." *Id.* Additionally, "The demand must *** be actual. The mere fact that the insured 'reasonably conclud[ed] that a

---

5     The court in *Anderson Brothers, Inc. v. St. Paul Fire & Marine Insurance Co.*, 729 F.3d 923, 934 (9th Cir. 2013), made the observation quoted above in response to an argument that classifying 104(e) letters as "suits" would render a separate provision for "claims" meaningless because 104(e) letters are like demand letters, which qualify as "claims." The court construed a statutory definition of "suit" to determine whether it applied and whether a 104(e) letter fit that definition. *Anderson Brothers*, 729 F.3d at 931-32. The statute defined "suit" to mean any action by the EPA in which the EPA directs or requests an insured to "take action" with respect to contamination. *Id*. at 931. The court found the statutory definition applied, and that the 104(e) letter requested that the insured "take action" by responding to the request for information. *Id*. at 935. This case is inapposite because the definition of "Claim" in this case does not include a request by the EPA for the insured to "take action." Moreover, the definitions are materially different in that the statute only required a direction or request to "take action," which is broad and may encompass many activities, whereas the Indian Harbor policy is specific in requiring an allegation of liability or responsibility on the part of the insured.

claim would inevitably be brought' would be insufficient to trigger coverage under a claims-made policy." *Id.*

¶ 87    The insurer in *Richardson* argued that a claim must be a demand for a payment of money. *Id.* at 701. The *Richardson* court found that a demand for money is not required for a claim. *Id.* *Richardson* rejected applying *Trice v. Employers Reinsurance Corp.*, No. 97-1271, 1997 WL 449736 (7th Cir. July 28, 1997), in which the court held that " ' [r]requests for information—even if they allude specifically to the possibility of a lawsuit—do not constitute a "demand for money or services" within the meaning of a claims-made policy.' " *Id.* (quoting *Trice*, No. 97-1271, 1997 WL 449736, at *3). The court held that "[t]he subpoenas and other demands made in antitrust investigations constituted a claim within the meaning of the policy." *Id.*

¶ 88    *Richardson* does not alter our position. First, *Richardson* involved a policy that did not define "claim." "When construing the language of an insurance policy, a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). "If the language is unambiguous, the provision will be applied as written, unless it contravenes public policy. *** A policy provision is not rendered ambiguous simply because the parties disagree as to its meaning." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010). Unlike *Richardson*, we do not apply a broad definition of "Claim" because it is undefined in the policy. The Indian Harbor policy defines "Claim," the term is unambiguous, and we are constrained to apply it as written; the 104(e) letter is not a "Claim."

¶ 89    Second, the 104(e) letter does not demand anything, money or otherwise. It merely asks the recipient to provide information and states that if they do not, then EPA has the option to take more aggressive action. See 42 U.S.C.A. § 9604(e)(5)(A) (2024) ("If consent is not granted

regarding any request made by an officer, employee, or representative under paragraph (2) ***
[the] President may issue an order directing compliance with the request."). To any extent
WestRock thought the 104(e) letter would "invariably" lead to an enforcement action by the
EPA, the *Richardson* court found that "[t]he mere fact that the insured 'reasonably conclud[ed]
that a claim would inevitably be brought' would be insufficient to trigger coverage under a
claims-made policy." *Richardson*, 120 F. Supp. 2d at 701. Our holding is not based on the
absence of a demand for money (that is, we are not "injecting a remediation expense demand"
into the policy); our holding is based on the absence of a demand for anything, pecuniary or
otherwise, for which WestRock is obligated in law or for which WestRock is "actually"
responsible (see *id*.).

¶ 90     We also reject WestRock's argument that even a tacit assertion of responsibility can be a
"Claim" under Illinois law. In *Central Illinois Light Co.*, 213 Ill. 2d at 144 (*CILCO*), the Illinois
Environmental Protection Agency (IEPA) held a meeting to discuss possible environmental
contamination by the insured and others. *Id*. at 146-47. At this meeting the insured was informed
that it was strictly liable for the environmental contamination at issue. *Id*. at 147. The participants
were notified that the IEPA could bring suit to compel investigation and remediation of the
contamination, or they could act voluntarily. *Id*. "The IEPA officials presenting this information
also informed the utilities that they could deal with this liability 'the easy way or the hard way.' "
*Id*. The insured chose to act voluntarily to investigate and remediate the contamination. *Id*. It
then sought indemnification from its insurer for its expenditures. *Id*. at 148.

¶ 91     The insurer argued that a lawsuit or other adversarial proceeding was required to trigger
its duty to indemnify. *Id*. at 151. Our supreme court found that the policies at issue "contemplate
than an insured may become legally obligated to pay damages in the absence of a lawsuit." *Id*. at

163. Our supreme court found that for there to be a "legal obligation to pay" the insured "must be acting in response to a claim." *Id*. at 172, 174 ("at the very least, an insured who seeks indemnification on the basis that it acted under a legal obligation imposed by a strict liability statute must have acted in response to an assertion *** that it must act or face the consequences."). In *CILCO*, the insured "was confronted with a claim in the form of an assertion by the IEPA that the agency intended to enforce the strict liability provision ***. *** The IEPA official tacitly threatened litigation by making the 'easy way or the hard way' remark. This is sufficient to satisfy the requirement of a claim ***." *Id*. at 174-75.

¶ 92     The legal obligation of the insured in *CILCO* was not the result of a "tacit" assertion. On the contrary, the court found that the IEPA explicitly confronted the insured with a claim "in the form of an assertion *** the agency intended to enforce the strict liability provision" (*id*.) "one way or the other" (*id*. at 164). The only "tacit" assertion was litigation; but that is of no consequence to the decision (or this case) because the court had already found that the policies contemplated the insured becoming legally obligated "in the absence of a lawsuit." *Id*. at 162, 166. Moreover, we find that *CILCO* supports our decision in that to satisfy the requirement of a claim the court required a legal obligation and an assertion that the insured must act or "face the consequences." *Id*. at 172. Again, the possibility that the EPA might take enforcement action if WestRock did not respond to the 104(e) letter is not a "legal obligation" and is not one of the type the court considered in *CILCO* where the IEPA actually threatened consequences of a strict liability statute. In *CILCO*, the "consequences" were certain; in this case, any "consequences" from the 104(e) letter are at best speculative. And, as *Richarson* instructs, "[t]he demand must *** be actual." *Richardson*, 120 F. Supp. 2d at 701, see also *Jensen v. Snellings*, 841 F.2d 600, 616 (5th Cir. 1988) (quoting *Hoyt v. St. Paul Fire & Marine Insurance Co.,* 607 F.2d 864, 866

(9th Cir.1979) (" 'an inquiry cannot be transformed into a claim or demand depending in each case on the reasonable expectations of the insured ***. Such a rule would firmly write uncertainty of coverage into every policy.' [Citation.]")).

¶ 93    WestRock's authorities do not persuade us to a different outcome. The 104(e) letter is not a "Claim" under the terms of the Indian Harbor policy.

¶ 94    Alternatively, WestRock argues that Indian Harbor acknowledged that the 104(e) letter was a "Claim" in an email that identified the EPA as a "claimant." We do not find that the email in question was an admission that the 104(e) letter was a "Claim." WestRock has not established any facts to qualify the statement in the email as an "admission," which is normally "a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge" that is not "not merely a matter of inference, opinion, estimate, or uncertain memory." *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 671 (1992) (describing judicial admissions). Regardless, the statement would not change our decision. We agree with Indian Harbor that the statement, which is extrinsic to the policy, is not a proper subject of consideration in construing the meaning of a "Claim" in the policy and whether the 104(e) letter satisfies that meaning. "The court may look to extrinsic materials only where the policy's language is ambiguous." *Sharp v. Trans Union L.L.C.*, 364 Ill. App. 3d 64, 71-72 (2006). We have found the policy is unambiguous and have applied the definitions and terms given their plain, ordinary meaning. We will construe the policy as written without the aid of extrinsic evidence. We find the 104(e) letter is not a "Claim" within the meaning of the policy.

¶ 95    Furthermore, WestRock argues if the 104(e) letter is not a "Claim," the Special Notice Letter is indisputably a "Claim" that it received during the Automatic Extended Reporting Period and that its delay in reporting the "Claim" beyond the Automatic Extended Reporting period

should be excused because it was not a material breach or under equitable principles. First, the parties dispute whether the Extended Reporting Period applies to the Special Notice Letter. The Indian Harbor Policy expired on August 1, 2014, and WestRock did not receive the Special Notice Letter until September 2014. Indian Harbor argues the Extended Reporting Period only applies to claims made against the insured during the policy period, and accepting the Special Notice Letter is a "Claim," the EPA made the claim outside the policy period, and the Extended Notice Provision does not apply.

¶ 96    Although not explicitly stated, WestRock must rely on the following provision in the Indian Harbor policy:

> "The Automatic Extended Reporting Period shall also apply to a CLAIM first
> made against the INSURED during the Automatic Extended Reporting Period,
> resulting from any POLLUTON CONDITION first discovered and reported to the
> Company, in writing, by the INSURED during the POLICY PERIOD and
> otherwise covered by this Policy. In this case, the CLAIM shall be deemed to
> have been made against the INSURED on the last day of the POLICY PERIOD."

¶ 97    We read this provision to mean that if WestRock reported the Pollution Condition to Indian Harbor during the policy period, but the EPA did not make its "Claim" against WestRock until after the policy expired but during the Extended Reporting Period, then WestRock could report the "Claim" to Indian Harbor during the Extended Reporting Period. WestRock informed Indian Harbor of the 104(e) letter during the policy period. We will accept, for purposes of this argument only, that WestRock thereby informed Indian Harbor of the Pollution Condition during the policy period and the EPA made its "Claim" based on that Pollution Condition during the Extended Reporting Period. Nonetheless, WestRock failed to report the "Claim" during the

Extended Reporting Period. The only issue we must decide is whether WestRock's failure should be excused. We find it should not.

¶ 98     WestRock relies on *Root v. American Equity Specialty Insurance Co.*, 130 Cal. App. 4th 926 (2005), in which "[t]he central issue [was] whether the policy period reporting requirement is a condition precedent of coverage that may be equitably excused when it works a forfeiture." *Root*, 130 Cal. App. 4th at 942. The court found that "the reporting condition in Root's policy here does not go to basic coverage but *** functions like a condition, not an element of the fundamental risk insured." *Id*. at 943. Having found that the reporting requirement in that case was a condition precedent, the court was free to apply "California's traditional common law" under which compliance may, in a proper case, be excused or equitable relief given against its enforcement. *Id*. at 929. The *Root* court cautioned, however, that, "Equities vary with the peculiar facts of each case. Sometimes—indeed most of the time—it will not be equitable to excuse the non-occurrence of the condition, so it is not excused." *Root*, 130 Cal. App. 4th at 948. Nonetheless, the court found that "given this record the facts are sufficient to support the equitable excuse of the reporting condition." *Id*. at 948.

¶ 99     WestRock argues *Root* is in accord with the "material breach doctrine" in Illinois. WestRock cites *Direct Auto Insurance Co. v. O'Neal*, 2022 IL App (1st) 211568, in which the insurer argued that the insured breached the notice provision of its automobile insurance policy. *O'Neal*, 2022 IL App (1st) 211568, ¶ 16. The court found that it was "clear that [the] defendant breached the notice provision." *Id*. ¶ 17. The court noted that "only a material breach of a contact provision can justify the other party's nonperformance." *Id*.

"A breach is material when it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement' or when the 'failure to

- 43 -

perform renders performance of the rest of the contract different in substance from the original agreement.' [Citation.] 'The breach must be so material and important as to justify the injured party in regarding the whole transaction as at an end.' [Citation.] The materiality of a breach depends on

> 'whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.' [Citation.]"
>
> *O'Neal*, 2022 IL App (1st) 211568, ¶ 15.

¶ 100   WestRock does not argue that its failure to timely report the Special Notice Letter was not a "material breach" but it does argue that the "facts here warrant the same result as in *Root* and *O'Neal*." We disagree. *Root* is patently distinguishable. Besides having little weight in Illinois, the decision was based on "the particular circumstances of [the] case." *Root*, 130 Cal. App. 4th at 929. The *Root* court excused noncompliance based on California common law. *Id*. at 929-30. Unlike *Root*, here we find that the reporting requirement is an element of coverage in this claims-made policy.

> "A claims-made policy imposes a more rigid notice requirement, because it links coverage to the claim and notice rather than to the injury. Timing of suit and notice determines which policy applies—if any does. Coverage for claims made in a later period requires an additional premium ***. The district court's decision [that a claims-made policy remained viable despite faulty notice]

effectively required [the insurer] to cover more than one year's claims, but for only one year's premium. *** [The insurer] is bound only for the year's coverage it contracted to supply. The question at hand is whether Illinois enforces notice requirements in claims-made policies. As far as we can see, it does. [Citations.] No case we have found *** invokes public policy to require the underwriter of a claims-made policy to defend or indemnify a claim of which it did not learn until after the policy expired." *Home Insurance Co. of Illinois v. Adco Oil Co.*, 154 F.3d 739, 742 (7th Cir. 1998).

Furthermore, " 'an insurer need not demonstrate prejudice to deny coverage when an insured does not give notice within the policy's specified time frame.' [Citation.] Allowing coverage beyond that period would grant the insured more coverage than he bargained and paid for and would require the insurer to assume coverage for risks for which it had not bargained. [Citations.]" *Pennzoil*, 653 F. Supp. 2d at 697-98.

¶ 101    We find that *Root* is inapposite. Similarly, *O'Neal* does not aid WestRock. In the case of a claims-made policy like Indian Harbor's, failure to comply with the reporting requirement *does* "defeat the objects of the parties in making the agreement" and does "render performance of the rest of the contract different in substance from the original agreement." *O'Neal*, 2022 IL App (1st) 211568, ¶ 15, *Home Insurance Co.*, 154 F.3d at 742. Therefore, under *O'Neal*, we would find a material breach of the Indian Harbor policy.

¶ 102    We find WestRock's failure to comply with the notice requirement in the Indian Harbor policy cannot be excused on equitable grounds. Accordingly, WestRock has no right to coverage from Indian Harbor. Because the failure to comply cannot be excused, WestRock is not entitled to discovery on the issue. We affirm the trial court's judgment in favor of Indian Harbor.

¶ 103                                    CONCLUSION

¶ 104   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 105   Affirmed.